In re the Marriage of:

## Danny B. Noble, Petitioner-Respondent,

v.

## Deborah P. Noble, Respondent-Appellant.†

Court of Appeals

*No. 2004AP2933. Submitted on briefs August 10, 2005.*
*—Decided September 21, 2005.*

2005 WI App 227

(Also reported in 706 N.W.2d 166.)

† Petition to review denied 1-20-06.

700

701

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Frances H. Martin* of *Bird, Martin & Salomon, S.C.*, Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Peter J. Ludwig*, Burlington.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. This appeal concerns the trial court's division of property in this divorce action between Deborah P. and Danny B. Noble. Danny and his

brother, Dale Noble, are equal partners in a farming business organized as a partnership. During the 1990s, Dale and his wife acquired and titled in their own names three properties the partnership uses for farming. Deborah maintains that the trial court erred in excluding the value of the properties from the marital estate because Danny committed marital waste with regard to these properties. She points out that Danny admitted that Dale and his wife acquired the properties and titled them in their own names for the express purpose of keeping the properties out of the marital estate in the event she and Danny divorced. Deborah claims that the use of partnership funds to purchase the properties improperly dissipated the value of the marital estate. She also challenges the trial court's valuation of real estate included in the marital estate.

¶ 2. We hold that the trial court properly excluded from the marital estate the value of the three properties at issue. In short, the law does not require a party to a prospective divorce to take advantage of an opportunity to acquire property that would increase the value of the marital estate, and the use of partnership funds to finance the purchase of the properties did not improperly dissipate the value of the marital estate. We further hold that the trial court did not err in adopting Danny's expert's valuation of the real estate. The court simply made a credibility determination with which we cannot quarrel. We affirm the judgment of the trial court.

## BACKGROUND

¶ 3. Deborah and Danny were married in November 1982. Danny originally filed a petition for divorce in February 1993, but the petition was dismissed later that year. Danny filed the petition for divorce in this appeal on November 6, 2002. The trial was held in

703

March 2004. Although the trial court considered numerous issues at trial, only the two questions concerning the property division are up for our review. We limit our recitation of the facts accordingly.

¶ 4. We first relate the facts that pertain to Deborah's claim that Danny committed marital waste. The partnership, Noble Grain Farms, was organized on January 1, 1976. The partnership originally included Willard Noble, the Noble brothers' father, but he retired in 1991. Dale and Danny are now equal partners in the partnership.

¶ 5. The partnership consists of equipment, inventory, stock and good will and derives its income primarily from the sale of grain. The partnership itself does not own any land. Willard and his wife, Danny and Deborah, and Dale and his wife own several of the properties in one-third shares; Danny and Dale own one property in equal shares; and Dale and his wife own three properties in their names alone. The partnership rents the remaining land it farms.

¶ 6. Prior to the purchase of the three properties owned by Dale and his wife, if Danny and Dale wished to acquire property for the partnership to farm, Danny and Dale would withdraw partnership funds and purchase the property. According to Danny, the properties would then be titled in Willard's, Danny's and Dale's names.

¶ 7. Between 1994 and 1999, Dale and his wife purchased the three properties in question for partnership use and titled them in their names only. These properties are known as the Spriggs, Raboine and Hegemann properties.[1]

---

[1] We note the record offers several different spellings for the Hegemann property. We chose the same spelling that can be found in the partnership's bookkeeping records.

¶ 8. Danny testified that when he and Dale deviated from their established practice of having properties purchased for partnership purposes titled in both their names, he had it "in the back of [his] mind" "to keep [the properties] out of [Deborah's] name in the event of divorce." According to Danny, "[T]hings were not going well in my marriage."

¶ 9. However, Danny also explained that one of the properties, the Spriggs property, was made available for purchase only to Spriggs family members. Dale and his wife were able to acquire the property because his wife is related to the Spriggs family. He further stated that he was also concerned about Deborah's erratic behavior and was worried that she would interfere with the acquisition of the properties. He noted that the partnership had already been renting two of the properties (the Raboine and Hegemann properties), which were also adjacent to properties the partnership farmed. As Danny testified, "The farm partnership needs land to create income."

¶ 10. Partnership assets were used to finance the purchases of the three properties. A ledger balance was then opened on the partnership books reflecting the amount Dale and his wife owed the partnership. Rather than have the partnership pay Dale and his wife rent for the use of the property, an amount equivalent to the value of the rent was forgiven on the obligation Dale and his wife owed to the partnership each year. Apparently, this financing arrangement had not been used by the partnership before.

¶ 11. In its oral decision, the trial court rejected Deborah's notion that these facts demonstrated that Danny had engaged in some kind of misconduct warranting the inclusion in the marital estate of the value of the three properties. The court noted that one of the

properties "was not available to the general public, and it was only by virtue of that family relationship that Dale and [his wife] were able to purchase the property at $1,400 an acre." The court observed that Deborah was not being cooperative in purchasing additional property and that "Dale did not want to risk losing the property and given the fact that they were renting acreage adjacent to the property, he purchased it in his own name." The court further noted that while Dale and his wife borrowed money from the partnership in order to pay for the property, they repayed the partnership "by way of rental income":

> The land is farmed by the partnership, a fair rental value was calculated based upon what the partnership was paying for other similar rented property, and that was the amount that was credited for the debt every year. Every year the ledger shows that the amount of the loan is decreased by the fair rental value. I found nothing wrong, nothing sinister about that practice; in fact . . . the testimony was undisputed that the partnership would not have made it if they would have had to actually pay out money for that rent.

In summing up its conclusion, the court commented that the decision to title the property in the names of Dale and his wife was "nothing other than a sound business decision." The trial court accounted for the outstanding obligation Dale and his wife owed as of the date of divorce, which the court called an account receivable, in its property division.

¶ 12. We next turn to the facts that pertain to Deborah's claim that the trial court erroneously relied on Danny's expert's valuation of certain real estate. Danny's expert, Robert Dirksmeyer, used what he called the "use value" approach to valuing the real estate. Dirksmeyer defined "use value" as

the value of specific property for a specific use. This value concept is based on the productivity of an economic good. Use value refers to the value that the real estate contributes to the enterprise of which it is part, without regard to highest or best use or the monetary amount that might be realized upon its sale.

He acknowledged that the "highest and best use" could be to develop the real estate or turn it into small hobby farms, but because Danny and Dale planned to continue to farm the land, he conducted his appraisal based on its use as "agricultural land." Using this method, Dirksmeyer valued the land at an average of $3000 per acre, for a total value of $4,359,090. He testified that assuming the partnership was going to continue to farm the land, this value is what the parties could have obtained in an arms-length transaction with a prudent farmer.

¶ 13. Deborah's valuation expert, Arthur Liddicoat, valued the land using a "market value" approach. Liddicoat defined "market value" as

the most probable price which the property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgably and assuming the price is not affected by undue stimulus.

Using this valuation method, Liddicoat valued the land at an average of $5000 per acre, for a total value of $10,534,000. He testified that he reached this value viewing the land "in its configuration as farmland," but that he was "looking at agricultural land that city people are picking up as hobby farms."

¶ 14. After considering the testimony, the trial court issued an oral decision in which it rejected Liddicoat's valuation method as "flawed" and adopted Dirksmeyer's valuation of the properties because it "was

far more credible." The court rejected Liddicoat's testimony that the land at issue was not farmland anymore, stating "The land has been used solely for farmland, solely for farming for at least the last 36 years, and there was absolutely no evidence in the record to indicate that it would be used for anything but farming for the foreseeable future." The court noted the inconsistencies in Liddicoat's testimony, recounting that Liddicoat had also testified that the land would continue to be used for agricultural purposes. The court further expressed concern that Liddicoat's analysis and comparables did not appropriately factor in the differences in zoning between the properties. The court also found "very troubling" the fact that Liddicoat was not familiar with an ordinance in the Town of Dover, where there was "a very significant amount of Noble acreage." According to the court, the ordinance put a moratorium on any development in the town "for a number of years."

## DISCUSSION

### Standard of Review

¶ 15. The determination of whether property is subject to division involves the application of a statute to uncontested facts, a question of law that we review independently. *Waln v. Waln*, 2005 WI App 54, ¶ 7, 280 Wis. 2d 253, 694 N.W.2d 452. Property division, however, is committed to the discretion of the trial court. *Peerenboom v. Peerenboom*, 147 Wis. 2d 547, 551, 433 N.W.2d 282 (Ct. App. 1988). We will uphold a property division if the court gave rational reasons for its decision and based its decision on facts in the record. *Id.* The valuation of a given asset, however, is a factual determination. *See Siker v. Siker*, 225 Wis. 2d 522, 532,

593 N.W.2d 830 (Ct. App. 1999). When reviewing fact finding, appellate courts search the record for evidence to support findings reached by the trial court, not for evidence to support findings the trial court could have reached but did not. *Johnson v. Merta*, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980).

¶ 16. The weight and credibility to be given to testimony is uniquely within the province of the trial court. *Siker*, 225 Wis. 2d at 528. When two parties to a divorce present conflicting testimony concerning the value of property, the trial court's job is to determine the credibility of the witnesses, weigh the evidence, and resolve the dispute. *See Schwartz v. Linders*, 145 Wis. 2d 258, 265, 426 N.W.2d 97 (Ct. App. 1988). In such situations, the trial court is the ultimate arbiter of the credibility of the witnesses. *Siker*, 225 Wis. 2d at 528.

*Marital Waste*

¶ 17. Deborah asserts that Danny committed marital waste and breached his duty of good faith with regard to marital property. She complains that the acquisition and titling of the three properties in the names of Dale and his wife was a subterfuge aimed at keeping the properties out of the marital estate. She further complains that because partnership funds were used to purchase the properties, the value of the marital estate was improperly dissipated. Deborah points out that Danny's share of the partnership funds are a part of the marital estate. She claims that the remedy for Danny's alleged dissipation of the marital estate and for his breach of his duty of good faith is to include the value of the three properties in the marital estate for purposes of property division.

709

¶ 18. Deborah's claim for a breach of the duty of good faith rests to some degree upon WIS. STAT. § 766.15 (2003–04),[2] which provides in part, "Each spouse shall act in good faith with respect to the other spouse in matters involving marital property or other property of the other spouse." WISCONSIN STAT. § 766.70 sets forth the remedies for a breach of the duty. However, once the divorce action is filed, the § 766.15 cause of action and its attendant remedy are no longer available. *Gardner v. Gardner*, 175 Wis. 2d 420, 427, 499 N.W.2d 266 (Ct. App. 1993). Instead, the trial court may consider "each party's efforts to preserve marital assets and to require a party to pay the debts caused by the squandering of the parties' assets, or the intentional or neglectful destruction of property," *see Anstutz v. Anstutz*, 112 Wis. 2d 10, 13, 331 N.W.2d 844 (Ct. App. 1983) (citing WIS. STAT. § 767.255(3)), and may include in the marital estate the value of the assets which would have been in the marital estate but for the waste. *See* WIS. STAT. § 767.275. We therefore address Deborah's request that the court include the three properties in the value of the marital estate within the context of §§ 767.255(3) and 767.275 and the case law interpreting those two statutory provisions.

¶ 19. We conclude the trial court properly excluded the value of the three properties from the marital estate. First, it does not matter that Danny refused to purchase the properties, in large part for the purpose of keeping them out of the marital estate. The statutes are intended to prevent the *squandering* or

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

*destruction* of marital property, or in other words, the *unjustified depletion* of marital assets. *See* Wis. Stat. § 767.275 (speaking in terms of property being "transferred for inadequate consideration" and "wasted"); *Anstutz*, 112 Wis. 2d at 12–13 (holding that Wis. Stat. § 767.255(3) prohibits "the squandering of the parties' assets, or the intentional or neglectful destruction of property" or the "unjustified depletion of marital assets"). Neither § 767.255(3) nor § 767.275 require a party to a pending divorce to take advantage of an opportunity to acquire property that would *increase* the value of the marital estate. This is so even if the opportunity represents a good deal. In fact, divorce attorneys routinely and wisely advise their clients not to purchase property for the benefit of the martial estate in the face of a prospective divorce. We find nothing amiss with this practice.

¶ 20. The cases Deborah cites are of little assistance to her. In none of the cases were the courts concerned, as we are here, with whether the failure of a party to a pending divorce to acquire new assets to enhance the value of the marital estate for purposes of property division constitutes marital waste. *See Gardner*, 175 Wis. 2d at 424 & n. 1 (dismissing tort claim of one spouse who argued that the other had made intentional misrepresentations and wrongful transfers of marital assets); *Anstutz*, 112 Wis. 2d at 13–14 (remanding for trial court to consider whether one spouse had depleted the marital assets because of his squandering and neglect and noting the spouse's "problem with alcohol"); *Zabel v. Zabel*, 210 Wis. 2d 336, 338, 344, 565 N.W.2d 240 (Ct. App. 1997) (holding that the mother of a husband could be joined as a third party in the divorce action where wife alleged that real property titled in the mother's name was marital property subject to division,

but stating that the parties were free to litigate the question of whether the real property at issue was in fact marital property); *Derr v. Derr*, 2005 WI App 63, ¶¶ 63, 67, 280 Wis. 2d 681, 696 N.W.2d 170 (concluding that one spouse had "wasted" marital property when he supposedly lost $45,000 while engaging in day-trading); *Antone v. Antone*, 645 N.W.2d 96, 101–03 (Minn. 2002) (holding that the formula used in Minnesota for determining the marital and nonmarital interests in property acquired during the marriage with nonmarital funds could also be used to determine marital and nonmarital interests in property acquired during the marriage with a nonmarital down payment, as well as appreciation of property acquired before the marriage).

¶ 21. Second, the fact that Danny permitted partnership funds to be used to finance the purchase by Dale and his wife of the three proprieties does not constitute the waste, squandering, destruction, or unjustified depletion of marital assets under the facts of this case. As the trial court noted, the purchase by Dale and his wife of the properties with the backing of partnership funds was simply a "sound business decision."

¶ 22. The record supports the trial court's findings that Deborah had not been cooperative in the purchase of additional property and Danny and Dale did not want to risk losing the properties, given that they were farming acreage adjacent to two of the three properties. In addition, the record shows that the other of the three properties was made available exclusively to members of the family, of which only Dale's wife was one.

¶ 23. The record further supports the trial court's conclusion that there was "nothing wrong, nothing sinister" about the financing arrangement in this case.

A ledger balance was opened on the partnership books reflecting the amount Dale and his wife owed the partnership. Then, rather than have the partnership pay Dale and his wife rent for the use of the properties, an amount equivalent to the value of the rent was forgiven on the obligation Dale and his wife owed to the partnership each year. Deborah characterizes the buy-down payments as "phantom rent." However, as Danny points out, the result would not have been any different had the partnership actually paid rent to Dale and his wife because Dale and his wife would have simply turned around and paid that rent right back to the partnership to satisfy their obligation.

¶ 24. Importantly, the outstanding obligation Dale and his wife owed as of the date of divorce was factored into the trial court's valuation of the partnership as an account receivable. We find no evidence that these buy-down payments were at all greater than the rental value of the properties, that the partnership records concerning the transactions are inaccurate, or that Dale and his wife received a disproportionate benefit under the arrangement. Given these circumstances, we hold that the marital estate was not improperly dissipated.

■■■

¶ 25. In sum, we conclude that the trial court properly excluded the value of the three properties from its valuation of the marital estate. The law does not require a party to a pending divorce to take advantage of opportunities to acquire properties that will increase the value of the marital estate. We further hold that the purchase by Dale and his wife of the three properties with the backing of partnership funds did not improperly dissipate the value of the marital estate.

¶ 26. Deborah next challenges the trial court's valuation of certain real estate Danny and Dale own. She contends that the trial court's adoption of the testimony and opinion of Danny's expert over her own expert was an error of law. She bases this argument on Danny's expert's testimony that he used the "use value" approach to the valuation of the property instead of the "market value" approach her own expert used.

¶ 27. The trial court rejected Deborah's expert's valuation of the real estate on credibility grounds, calling Liddicoat's methodology and analysis "flawed." The court gave reasons for its conclusion based upon the evidence. The court highlighted the inconsistencies in Liddicoat's testimony, the inherent problems with the comparables Liddicoat used and Liddicoat's failure to properly account for town zoning codes and town ordinances. The court also rejected as contrary to the plain evidence Liddicoat's conclusion that the land in question was no longer farmland. Because the trial court discounted Liddicoat's testimony and opinion, the only remaining evidence in the record concerning the value of the real estate was that of Danny's valuation expert. The court found his testimony "far more credible" and therefore used his valuation in the property division. The trial court is the ultimate and final arbiter of the credibility of witnesses, and we must accept the trial court's credibility determination. *See Kimberly Area Sch. Dist. v. Zdanovec*, 222 Wis. 2d 27, 50, 586 N.W.2d 41 (Ct. App. 1998).

¶ 28. The parties devote considerable attention in their briefs to their conflicting understandings of the

appropriate method of valuation for the real estate in question. In light of the court's credibility determinations, we conclude that it is unnecessary to resolve their dispute. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983). Therefore, we affirm the trial court's valuation of the real estate.

*By the Court.*—Judgment affirmed.