# COURT OF APPEALS
# DECISION
# DATED AND FILED

## March 30, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.  2021AP94**
**2021AP95**
**STATE OF WISCONSIN**

Cir. Ct. Nos.  2019TP32
2019TP33

**IN COURT OF APPEALS
DISTRICT I**

APPEAL NO. 2021AP94

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.A.M., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

A.M.-C,

      RESPONDENT-APPELLANT.

**APPEAL NO. 2021AP95**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO E.A.M., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

> **PETITIONER-RESPONDENT,**

> **V.**

**A.M.-C,**

> **RESPONDENT-APPELLANT.**

APPEALS from orders of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed.*

¶1 WHITE, J.[1] A.M.-C. appeals the trial court orders terminating her parental rights to two of her children, J.A.M. and E.A.M. She argues that the trial court erred when it entered default judgment against her on the grounds for termination and again when it found it was in the best interests of her children to order the termination of her parental rights. We conclude the trial court's exercise of discretion in both matters was reasonable and appropriate, and, accordingly, we affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

## BACKGROUND

¶2      The State filed a petition to terminate A.M.-C.'s parental rights to J.A.M. and E.A.M. on March 1, 2019.  The State's grounds were that the children remained in need of continuing CHIPS[2] and A.M.-C. failed to assume parental responsibilities.  J.A.M., born in October 2015, was removed from his mother's care in July 2016 after a domestic violence incident in which his alleged father[3] threatened to kill both A.M.-C. and J.A.M.  At birth, the Division of Milwaukee Child Protective Services (DMCPS) imposed a safety plan for A.M.-C. to care for J.A.M. under the supervision of her family because A.M.-C. had two older children in out-of-home care due to a prior CHIPS order.  E.A.M. was born in December 2016 and was detained by DMCPS from the hospital the next day because DMCPS had ongoing concerns about A.M.-C.'s mental health, domestic violence, and her inability to meet the court-ordered conditions for the return of her children.

¶3      At the initial plea hearing on the termination of parental rights (TPR) petition, the circuit court[4] adjourned the proceedings for A.M.-C. to be appointed adversary counsel and reappointed the guardian ad litem (GAL) who represented

---

[2] "CHIPS is the commonly used acronym to denote the phrase 'child in need of protection or services' as used in the Wisconsin Children's Code, chapter 48, Stats." *Marinette Cnty. v. Tammy C*., 219 Wis. 2d 206, 209 n.1, 579 N.W.2d 635 (1998).

[3] The same man is alleged to be the father of J.A.M. and E.A.M.  He did not consent to a DNA test and generally refused to participate in legal proceedings.  The termination of his rights (or that of an unknown father) is not before us.

[4] The Honorable Christopher R. Foley presided over the plea hearing and some pretrial proceedings; we refer to him as the circuit court.  The Honorable Mark A. Sanders presided over the grounds and disposition of the TPR; we refer to him as the trial court.

A.M.-C. in CHIPS proceedings for these children and for her two older children.[5] The circuit court notified A.M.-C. that she needed to return on the adjourned hearing date. "If you don't, you could be defaulted. That means you'd lose your right to fight against this because you didn't come to court."

¶4 At the adjourned plea hearing in April 2019, the circuit court was informed that A.M.-C. had mental health issues and multiple competency evaluations, as recently as 2017, and was found incompetent and unlikely to regain competency. Because A.M.-C. spoke Spanish as her primary language, Spanish language interpreters were also employed at all of A.M.-C.'s court appearances. A.M.-C., by counsel, entered a plea that she was contesting the State's petition. The circuit court again informed A.M.-C.:

> You have to appear for all the hearings, be on time for the hearings. You have to stay in touch with [your attorney and GAL]. They can't help you defend against this unless you maintain reasonable communication with them. So if your address changes or your phone number changes, you need to make sure that they know that information.

¶5 A.M.-C. did not appear at the hearing on the scheduled court trial on the grounds for the TPR on February 24, 2020. The children's case manager informed the trial court that A.M.-C. notified Saint A, the social services agency managing her case (the Agency), that she had moved to New York the previous month. A.M.-C.'s attorney informed the court that she had received police reports from December 2019 that "indicated that there was yet another altercation between [A.M.-C.] and her significant other." The trial court stated "so that I make sure that I understand that exactly, this isn't a situation of flight from an

---

[5] A.M.-C.'s parental rights to two of her children, E.A.M. and J.A.M.'s older siblings, were involuntarily terminated in October 2017. Their status is not at issue in this matter.

abuser or an alleged abuser. It would be a circumstance of flight with an alleged abuser." A.M.-C.'s attorney confirmed that the court was correct. The children's GAL informed the trial court that "there may have been a protective service referral open just shortly before that regarding the child in her care, and she fled with that child to New York and that child was detained in New York City."

¶6     A.M.-C.'s attorney moved the court to allow A.M.-C. to appear at the trial by telephone.[6] Trial counsel stated that it was her understanding that A.M.-C. moved to New York "to receive family support and comfort." Trial counsel said she spoke with A.M.-C. prior to the trial and A.M.-C. stated she could not afford to return to Milwaukee, but she "continued to express a desire to be reunited with her sons."

¶7     The State objected to having A.M.-C. participate in the trial telephonically because she could not meaningfully appear due to concerns about her mental health, cognitive limitations, and the complications of utilizing an interpreter by telephone. The State argued that A.M.-C. had missed a court appearance in the past, she had notice of the potential consequences of not appearing, and "this nonappearance is egregious and in bad faith." The State asked the trial court to find A.M.-C. in default and strike her contest posture with respect to the grounds phase, "subject to prove-up and set this matter forward for

---

[6] WISCONSIN STAT. § 806.17 allows the court to "admit oral testimony communicated to the court on the record by telephone or live audiovisual means, subject to cross-examination" in chapter 48 evidentiary hearings. To evaluate whether the proponent of oral testimony has shown good cause, the court's considerations may include: "[w]hether any undue surprise or prejudice would result"; "[w]hether the procedure would allow full effective cross-examination"; "[t]he importance of presenting the testimony of witnesses in open court, where the finder of fact may observe the demeanor of the witness"; "[w]hether the quality of the communication is sufficient to understand the offered testimony"; and any "other factors as the court may … determine to be relevant."

disposition."  The children's GAL agreed with the State and argued that A.M.-C.'s "failure to appear was intentional, it was egregious.  It was without good cause and it is in bad faith."

¶8      The trial court reviewed the situation, noting that A.M.-C. "was previously ordered to appear personally in court in connection with each and every appearance in this matter."  While the court agreed that in general it was better to have a parent participate than find her in default, the court also stated:

> In this situation, [A.M.-C.] has voluntarily chosen to move to the state of New York.  She has family there.  I'm glad that she has family there and that they are supportive of her. She moved around two months ago when she knew about today's trial date.  That can only be described as a choice. It was not a circumstance where she moved to flee an abusive relationship, as I gather the alleged abuser, at least from the December incident, is with her in New York.  It's not a situation where she moved for some reason that was enormously compelling, caring for a dying relative or something of significant consequence.  This was just a choice.

¶9      The trial court continued, noting that A.M.-C. "suffers from various mental health conditions, has some cognitive disabilities and there are language concerns as well."  The court considered her appearance in person to be "absolutely necessary" because it needed to be able to assess A.M.-C. and her understanding of the proceedings, and if she chose to testify, her credibility and demeanor.  The court stated that the difficulties created by the language barrier would be compounded by a telephone appearance.  Even with an interpreter in the courtroom talking to A.M.-C. on the phone, the court considered it nearly impossible to complete a trial because of the extra layers of complication. Because A.M.-C.'s motives to go to New York may have included:  (1) an attempt to avoid a child protective services referral in Wisconsin for her youngest child and (2) having her alleged abuser avoid being taken into custody in Wisconsin for

violating a condition of probation, the court concluded the flight to New York constituted bad faith. The court stated that "[e]ven if it were not in bad faith, it certainly is egregious." It also noted that this situation is not one where A.M.-C.'s poverty is interfering because the DMCPS would have paid to get her back to Wisconsin. The trial court ultimately denied A.M.-C.'s motion to appear by telephone.

¶10 Having concluded her conduct was egregious and in bad faith, the trial court found A.M.-C. in default and struck her contest posture. The court considered imposing a monetary fine as an alternate remedy, but found that cruel and not an appropriate remedy for someone in poverty. The trial court rejected delaying the trial in the hopes that A.M.-C. would return because it had no reason to believe that the circumstances that compelled A.M.-C. to miss the trial and go to New York would change. The trial court found A.M.-C. was in default subject to prove-up, but allowed her to remain on the phone to listen to the proceedings.

¶11 The dispositional hearing was delayed until July 2020 because the coronavirus pandemic shut down in-person proceedings in the state courts. At the hearing, the State presented the Agency case manager for the prove-up of the grounds for the TPR. The case manager reviewed when J.A.M. and E.A.M. were removed from the parental home as well as A.M.-C.'s failure to satisfy four of the five conditions of return of the children to her care. The State and the children's GAL joined in arguing that the grounds for the TPR were proven by clear and convincing evidence.

¶12 The trial court first addressed the evidence received in the prove-up hearing regarding A.M.-C.'s failure to assume parental responsibility. During the time the children were in foster care, A.M.-C. was inconsistently engaged in

visitation. A.M.-C. exposed the children to a hazardous living environment, particularly exposing J.A.M. to domestic violence. The trial court concluded that "the State has been able to demonstrate by clear, satisfactory and convincing evidence failure to assume parental responsibility with respect to [A.M.-C.]"

¶13    The trial court then reviewed the evidence received at the hearing to show that the children continued to be in need of protection or services (continuing CHIPS). The State demonstrated that DMCPS made a reasonable effort to provide services ordered by the court to A.M.-C. by attempting to provide therapy and medication management to A.M.-C., domestic violence programming, supervised visitation services, parenting skills coaching, and ongoing case management. The State proved that A.M.-C. has not been able to meet the conditions for the safe return of the children. A.M.-C. was unable to control her mental health, she continued to be involved in violence in her home or in front of the children, she could not show she could provide safe care for the children, and she did not maintain visitation with the children. The trial court found that the State proved that the grounds to terminate A.M.-C.'s parental rights based on continuing need of protection or services (CHIPS) existed.

¶14    Having concluded the State proved both grounds existed for the TPR, the trial court made a finding that A.M.-C. was unfit. The court then moved on to the disposition of the petition, to determine whether the TPR was in the best interests of the children. The court heard testimony from one of the children's foster parents, who has cared for J.A.M. since September 2016, and E.A.M. since shortly after his birth. The State also recalled the case manager, who reviewed the evidence regarding the factors in the best interest of the child determination. She testified that if the TPR was not granted, the children would continue to be in need of protection or services under a CHIPS order and there has not been behavioral

change significant enough by A.M.-C. that would allow the children to be returned to her care.

¶15    The final witness at the dispositional hearing was A.M.-C. A.M.-C. testified that she left Milwaukee because she did not have help in Milwaukee, but she had help in New York. She had plans to return to Wisconsin to be reunited with the boys. Her youngest child, the boys' younger sister, was taken by child protective services in New York after A.M.-C.'s former partner hit A.M.-C. in front of the girl. She testified that she had family surrounding her in New York and that it was in the best interests of the children for them to live with her there.

¶16    The trial court started its disposition of the case with credibility determinations. It found the foster mother's testimony to be credible and worthy of belief. It noted that she was able to describe the children's needs with a high level of detail. The court also found the children's case manager to be credible and worthy of belief. He noted the level of detail in her memory enhanced the credibility of her testimony. The trial court then stated that it did not believe A.M.-C. was "intentionally deceptive" but her testimony was undermined by its lack of detail and that "the accurate expression of [her] desire that may not have been converted into action."

¶17    The trial court then reviewed the six statutory factors it had to consider at a minimum when determining the best interests of the children. The first factor is the likelihood of adoption. The trial court considered it highly likely that if the children were available for adoption, they would be adopted by their foster parents. The foster parents have demonstrated their commitment to the boys over a long period of time. They have completed the steps to be approved for adoption. The court found the foster mother's testimony credible that she and her

wife would like to adopt the boys. The foster parents have integrated the boys into their family, which the court considered consistent with an intention to care for them. Finally, the trial court considered the children adoptable; if these foster parents were to fall through as an adoptive resource, the children were young and had no major health issues.

¶18 The second factor is the age and health of the children at the time of removal and the time of disposition. J.A.M. was removed when he was eight months and twenty-five days old; he was overweight and had ear infections, but no other significant health issues. E.A.M. was one day old at the time of removal; he had lactose intolerance and later developed asthma. At the time of disposition, J.A.M. was four years, nine months, and fourteen days old and E.A.M. was three years, nine months, and five days old. J.A.M. is healthy, with good weight and he has resolved an ear infection problem. His speech is advanced and he has a provisional ADHD diagnosis. E.A.M. is healthy and has asthma, but no other medical or behavioral concerns.

¶19 The third factor is whether the boys have a substantial relationship with their biological parents and family members, and then whether there would be harm in severing that relationship. The court acknowledged that A.M.-C. has a substantial relationship with the boys, but its analysis must be centered on "whether the boys have a substantial relationship with [A.M.-C.]. They do not. The best example of that is when [J.A.M.] asks who [A.M.-C.] is when seeing her on a video call."

¶20 The court concluded that A.M.-C.'s visitation was not frequent enough or of sufficient quality to develop a substantial relationship between the boys and her. The court found that neither child seemed to have any memory of

being in A.M.-C.'s care. On the issue of A.M.-C.'s argument that the boys had a substantial relationship with their younger sister, the court concluded that they "have knowledge of their sister" but they do not have a substantial relationship with her. The court concluded there would be no harm to the children to sever the relationship with A.M.-C.

¶21 The fourth factor is the children's wishes. The trial court found that the boys were too young to explicitly express a wish regarding adoption, but it noted that the boys call one foster mother "mama" and the other "dada." Further, their foster home is the only home they have effectively known. J.A.M. has been with his foster family for over 80% of his life and E.A.M. has been with them for more than 99% of his life.

¶22 The fifth factor is the duration of separation of the parent from the child. The trial court noted that J.A.M. was removed from A.M.-C.'s care before he was placed with this foster family; his duration of separation was more than 84% of his life. For E.A.M., he has been separated since he was one day old, which is over 99% of his life.

¶23 The sixth factor is whether they would be able to enter a more permanent and stable family relationship through termination. The trial court took into account that the conditions in the children's current foster placement was good because it was stable and that the children were well integrated into the family. The court also took into account that the likelihood of future placement with A.M.-C. was low, but not nonexistent. It noted A.M.-C. made bouts of progress, but she also experienced housing, employment, and mental health instability. Further she experienced domestic violence; instability and violence followed her to New York. The court considered A.M.-C.'s prior placements with

11

the children: E.A.M. was only in her care for one day, J.A.M. was with her for over eight months before he was removed. The court concluded that there was "no effective question that they would be able to enter a more stable and permanent family relationship through termination. That's particularly true because of the high likelihood of adoption by" their current foster parents.

¶24 The court ultimately found that based on its consideration of the statutory factors it was in the best interests of J.A.M. and E.A.M. to terminate the parental rights of A.M.-C.

¶25 A.M.-C. appeals the termination of her parental rights to both J.A.M. and E.A.M. We granted A.M.-C.'s motion to consolidate the separate cases in accordance with WIS. STAT. § 809.10(3).

## DISCUSSION

¶26 A.M.-C. argues that the trial court erroneously exercised its discretion in two ways: first, to default her and strike her contest posture for the grounds of the TPR, and second, to determine that terminating A.M.-C.'s rights was in the best interests of the children. We review each argument separately, but ultimately conclude there was no error in the trial court's exercise of discretion and affirm the order terminating A.M.-C.'s parental rights.

*Default and striking contest posture*

¶27 It is within the trial court's discretion to impose sanctions and to decide which sanctions to impose, including striking contest posture and entering default judgment in TPR proceedings. *See* ***Evelyn C.R. v. Tykila S.***, 2001 WI 110, ¶¶17-18, 246 Wis. 2d 1, 629 N.W.2d 768. We review the trial court's decision to impose a sanction of default judgment under the erroneous exercise of discretion

standard. ***Brandon Apparel Group., Inc. v. Pearson Properties, Ltd.***, 2001 WI App 205, ¶10, 247 Wis. 2d 521, 634 N.W.2d 544. "A [trial] court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." ***Dane Cnty. Dep't of Human Servs. v. Mabel K.***, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶28   The trial court has inherent and statutory authority to sanction a party for failing to obey a court order; however, those sanctions are limited to those that are "just." *See* WIS. STAT. §§ 804.12(2)(a), 805.03. "Wisconsin courts have interpreted this limitation to mean that dismissal requires that the non-complying party has acted egregiously or in bad faith." ***Industrial Roofing Servs., Inc. v. Marquardt***, 2007 WI 19, ¶43, 299 Wis. 2d 81, 726 N.W.2d 898. For a trial court to enter default judgment, it is not required to analyze a "specific set of factors" but instead it focuses on the degree to which the party's conduct impairs justice in this action and justice in the operation of our judicial system. ***Brandon Apparel***, 247 Wis. 2d 521, ¶11 (citations omitted).

¶29   A.M.-C. argues that her failure to appear in person at the trial was neither egregious or in bad faith. She asserts that she needed to move to New York because she was a victim of domestic violence and the move provided for her physical safety and economic security. Additionally, she argues she lacked financial means to return to Wisconsin. She argues the court should have granted her request to appear telephonically, which was allowable under WIS. STAT. § 807.13. She contends her telephonic appearance would not have prejudiced the State, would have only been to her own detriment, and would have been superior to having her not participate at all.

13

¶30    A.M.-C.'s appearance in person was ordered by the court and notice of its importance was explained to her on multiple occasions. Her nonappearance at the grounds hearing was a failure to comply with a court order. *See* WIS. STAT. §§ 804.12(2)(a), 805.03. Further, the record refutes each of A.M.-C.'s arguments why this nonappearance was not egregious and in bad faith: her nonappearance was her own choice; her financial insecurity to pay to return could have been alleviated by DMCPS; and her presence in person—not by telephone—was necessary for the trial proceedings.

¶31    Our examination of the record supports the trial court's conclusion that A.M.-C.'s nonappearance was her own choice. The trial court stated that this was "not a circumstance where she moved to flee an abusive relationship," because instead she fled with her alleged abuser. It stated that A.M.-C. presented no "enormously compelling" reason for missing the trial, such as caring for a dying relative. The trial court considered her motivation may also have included avoiding a child protective services referral for her youngest child and that her alleged abuser was avoiding being taken into custody for violating terms of Wisconsin probation. Therefore, its conclusion that A.M.-C. made a voluntary choice to stay in New York and not attend the hearing was reasonable.

¶32    The trial court acknowledged A.M.-C.'s challenges including her mental health conditions and financial insecurity. The trial court noted that "[i]f the only reason that [A.M.-C.] could not come back to Wisconsin was that she couldn't afford a bus ticket or even an airline ticket, that could have been arranged. [DMCPS] would have paid to get her here." A.M.-C.'s argument that her nonappearance should be excused based on her financial concerns fails because the record shows the trial court was willing to address this issue.

14

Therefore, her nonappearance was egregious and in bad faith. *See **Industrial Roofing***, 299 Wis. 2d 81, ¶43.

¶33 Furthermore, the trial court concluded her appearance in person was an "absolute necessity." The complications of her request were compounded by the difficulty of having A.M.-C. appear by telephone while utilizing an interpreter in the courtroom. We accept the trial court's assessment that "conducting a trial with [A.M.-C.] appearing on the telephone under these circumstances … is essentially impossible or close enough to impossible as to be extremely impractical." A.M.-C.'s argument that a telephone appearance would have been better than no appearance at all fails because the trial court would have not been able to discern her understanding of proceedings or to observe her demeanor. Moreover, the quality of communication would have been insufficient for the court's function to be accomplished

¶34 Our examination of the record supports the trial court's conclusion that A.M.-C.'s non-appearance was a choice, was egregious, and was in bad faith. The trial court considered alternate sanctions, but determined that placing her in default and striking her contest posture was the appropriate action. Here, the trial court reviewed the relevant facts, applied the proper legal standard and engaged in a rational process to reach a reasonable conclusion; therefore, we sustain its exercise of discretion. *See **Mabel K.***, 346 Wis. 2d 396, ¶39. We conclude the trial court did not err when it entered default judgment and struck her contest posture on the grounds for the TPR.

*Best interests of the children*

¶35 When the trial court has found that grounds exist for the TPR, the trial court then turns to the dispositional proceedings, where the focus shifts to the

best interests of the child. WIS. STAT. § 48.426; *see Sheboygan Cnty. DHS v. Julie A.B.*, 2002 WI 95, ¶28, 255 Wis. 2d 170, 648 N.W.2d 402. The trial court must consider, but is not limited to, the following six factors:

> (a) The likelihood of the child's adoption after termination.

> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

> (d) The wishes of the child.

> (e) The duration of the separation of the parent from the child.

> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

Sec. 48.426(3). The trial court is not required to afford greater weight to any particular factor, although the "record should reflect adequate consideration of and weight to each factor." *State v. Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475.

¶36 Whether the termination of parental rights is in the best interests of the child is a discretionary decision by the trial court. *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). We will not overturn a trial court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). A trial court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a

demonstrated rational process reaches a conclusion that a reasonable judge could reach. *Mabel K.*, 346 Wis. 2d 396, ¶39.

¶37    A.M.-C. argues that the trial court did not appropriately consider the significant relationship between A.M.-C. and her youngest daughter and J.A.M. and E.A.M. or the harm the children would suffer if the TPR were granted. A.M.-C. argues that the trial court's weighing of the statutory factors under WIS. STAT. § 48.426(3) was erroneous. A.M.-C. contends that because the evidence at the hearing showed that the children valued the relationship with their sister, the trial court erred to entirely discount the value of this relationship and the harm caused by severing that legal relationship.

¶38    Here, the record shows that the trial court reviewed the statutory factors on the record with careful consideration of the relevant facts and circumstances. A.M.-C. asks us to determine that the trial court's weight of the third factor—the substantial relationships between A.M.-C. and the children—was erroneous. This misstates our function as a reviewing court. It is our task to search for evidence to support the trial court findings, "not for evidence to support findings the trial court could have reached but did not." *Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166. The trial court listened to the testimony and evidence and observed A.M.-C.'s credibility and demeanor. A.M.-C. characterizes her contact with the children as regular visits that had "recently been via video conferencing." The record disputes this claim. Although A.M.-C. has had periods of regular visitation, there were only two video visits in the record, both short and both at the request of the children. Further, J.A.M. did not recognize A.M.-C. in the video in the foster mother's testimony. Rather than showing that the trial court weighed this factor erroneously, the video visit evidence supports the court's conclusion.

17

¶39     The trial court gave adequate consideration to all factors in WIS. STAT. § 48.426(3).  We conclude that the trial court applied the proper standard of law to the facts and made a reasonable exercise of discretion to terminate A.M.-C.'s parental rights.

*By the Court.*—Orders Affirmed.

This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)(4).