COURT OF APPEALS
DECISION
DATED AND FILED

October 4, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1338**

STATE OF WISCONSIN

Cir. Ct. No. 2021TP64

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J. W., JR., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

J. W.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: ELLEN R. BROSTROM, Judge. *Affirmed.*

¶1     WHITE, J.[1]   J.W. appeals the order terminating his parental rights to his son, J.W., Jr.  He argues that that the circuit court's finding that he was an unfit parent was clearly erroneous and that there was insufficient evidence to determine that terminating his parental rights was in his son's best interests.  We disagree and affirm.

## BACKGROUND

¶2     In March 2021, the State filed a petition to terminate the parental rights of Q.M. and J.W., the parents of J.W., Jr., who was born in June 2019, and who was removed from their care in January 2020 after an alleged incident of domestic violence by J.W. arising out of Q.M.'s drug use.[2]  The case proceeded to a jury trial on the grounds alleged against J.W.:  continuing child in need or protection or services (CHIPS), under WIS. STAT. § 48.415(2), and failure to assume parental responsibility, under § 48.415(6).  The State called three witnesses:  the initial assessment specialist, J.W., and the ongoing case manager.

¶3     The State's first witness was the initial assessment specialist from the Division of Milwaukee Child Protective Services (DMCPS), who testified that she removed J.W., Jr. to an out of home placement because of the "present danger" that "one or both parents were intoxicated or under the influence," and "that one or both parents were violent."

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Q.M.'s parental rights were also terminated and she separately appeals.  We discuss her case here only to the extent necessary and relevant to J.M.'s appeal.  Her case is released concurrently with J.W.'s case.  *See State v. Q.M.*, No. 2022AP1245, unpublished slip op., (WI App October 4, 2022).

¶4      The State's second witness was J.W., who testified he has been in a relationship with Q.M. for five or six years.  He was not aware that she probably had a heroin addiction, although he did know she sometimes took Suboxone,[3] and he was aware that she received inpatient and outpatient treatment at multiple substance abuse treatment facilities.  He testified there was a single domestic violence issue between them, when she stabbed him.  He testified that when the pandemic lockdown caused visitation and services to only be offered virtually, he refused to participate because he "…never was a phone [or video] person."  Two months later, in-person visitation resumed and it occurred fairly consistently on Mondays and Fridays at his home.  However, he did not engage in services related to the conditions of return in the dispositional order[4] until January 2021, when it became clear that services were only going to be offered virtually.  He completed a parenting class and a psychological evaluation in April 2021, and domestic violence counseling in June 2021.  In July 2021, the case manager made a referral for individual therapy as recommended in the psychological evaluation; however, he remained on the waiting list at the time of the hearing.

¶5      J.W. testified that he remained in a relationship with Q.M, and he did not think staying with her was putting his needs before his child's, because he did not consider her dangerous or "bad" towards their son.  If he had his son returned to his care, he would have Q.M. or his mother provide child care.  J.W. acknowledged he had not attended medical appointments; however, he gave

---

[3]  Suboxone is a medication commonly prescribed to treat opioid addiction.

[4]  J.W., Jr. was removed in January 2020 under a temporary physical custody order.  The court entered a dispositional order in June 2020, which listed multiple conditions for J.W. to satisfy to return his son to his care.

3

consents and permission to various healthcare professionals to treat his son. He did not know the name of any of the doctors. He did not know the name of his son's day care. He knew the first names but not the last name of the foster parents. He regularly texted with the foster parents; however, he did not call them or his son on a regular basis.

¶6     Finally, the State called the ongoing case manager from Children's of Wisconsin, the agency managing J.W., Jr.'s out of home care. She reviewed J.W.'s failure to satisfy multiple conditions in the dispositional order. First, she stated that J.W. had not made progress on the condition to "not allow violence in your home or in front of your child," because he had "not demonstrated that he has an understanding of the harm that domestic violence has had on his child" and he "continue[d] to minimize and/or deny any real history of domestic violence in the home." The case manager acknowledged that J.W. completed domestic violence counseling, but she did not believe he made progress in understanding the issue: he struggled to articulate what he learned and he denied or minimized a history of domestic violence with Q.M.

¶7     Second, the case manager testified that she did not believe J.W. made progress on the condition to "supervise your child and place your child's needs before your own" because he continues a relationship with Q.M., and considers her a safe caregiver if J.W., Jr. were returned to his care. J.W. reported he has not seen Q.M. using drugs, but he acknowledged there have been "instances of her slurring her speech and falling asleep" including an incident while changing J.W., Jr.'s diaper during visitation. The case manager was concerned because "when that was happening, [J.W.] was not intervening, did not express concern and still says he doesn't know if she is using [drugs]."

¶8      Third, the case manager testified that she did not believe he made progress on the condition that he control his emotions and actions daily because of an incident recently in which he called the visitation supervisor to explain he and Q.M. were running late and stated out loud—even if unclear that the words were aimed at the supervisor—"fuck you, bitch, I am done with your shit, go to hell."

¶9      The case manager testified that J.W. had been cooperative and willing to sign consents, but he struggled in showing an ability to protect his son. The case manager testified that J.W. was consistent with visitation, attentive to J.W., Jr., and provides for his son's basic care during the visits. However, J.W. had at least a six-month delay in beginning services to which he was referred—family support, parenting classes, fatherhood classes—because of his refusal to participate virtually.

¶10     The jury returned verdicts finding that both grounds existed. Having found that the grounds existed, the court made the required finding that J.W. was an unfit parent, pursuant to WIS. STAT. § 48.424(4). The jury was dismissed and the case proceeded to the second phase for the disposition of the TPR petition.[5] The first witness was J.W., Jr's foster father, who testified that he and his wife were willing and interested in maintaining contact with the biological family if the TPR were granted and adoption occurred.

¶11     Next, the case manager then returned to the stand and testified that in the almost two years that J.W., Jr., "has been in out-of-home care … neither parent has made nearly sufficient progress to alleviate the safety concerns that we have."

_____

[5] Q.M. pleaded no-contest to the grounds alleged in the TPR petition with regard to her rights. After the jury verdict against J.W., a joint dispositional hearing was held.

Her testimony repeated many of her same concerns from the grounds phase of the proceedings. J.W. needed to recognize the dangers from having Q.M. around their son and to show that he appreciated the possible or actual impact Q.M. has on his own life and J.W., Jr.'s life. Further, the case manager discussed the neglect that J.W., Jr. showed at removal: missing immunizations, dental issues, and gross and fine motor delays. "He could not hold himself in a sitting position. He would not roll over. He had very low muscle tone in his legs." While J.W. provided consent for treatment, he did not attend any medical appointments; further, he did not ask the case manager for updates on J.W., Jr.'s physical development or how he was doing in day care.

¶12   The case manager testified that J.W. had a "very positive relationship" with his son. J.W. had eight children other than J.W., Jr., none of whom are in his custody. His mother has guardianship of two of the children, including J.W., Jr.'s full biological sister with Q.M. Four of the children were placed with their mothers. His parental rights for two of the children have been terminated and they have been adopted.

¶13   J.W. returned to the stand in his own defense. J.W. testified that he pays child support. He provided shoes, clothing, strollers, car seats, baby toys, and baby wipes. He testified that his mother would provide child care if J.W., Jr. were returned to his care. He would accept a guardianship by the foster parents, but asked that his parental rights be maintained. He admitted he has not been the primary caretaker for the majority of the lives of any of his nine children.

¶14   During the court review of the dispositional decision, the circuit court addressed its concerns about J.W. Jr.'s safety in the care of his parents. The court addressed that while domestic violence was mentioned multiple times in the

case, its "decision [was] not going to rise and fall on the issue of domestic violence." It stated:

> A parent who has a child with another parent [who has] some kind of issue that creates a significant safety concern for the child should be like a papa bear or mama bear. There should be a visceral, protective response. There should be a visceral recognition that the other parent is threatening your child. And that has never happened in this case.

The court remarked that J.W. "is a good guy admittedly on many levels has got a solid job and has got himself a home." It noted that "[o]bviously, he loves [J.W., Jr.]." However, he failed to show a protective ability and insight into the dynamics with Q.M. But the court stated that as much as J.W. was a good guy, the court must focus on the best interests of J.W., Jr.

¶15 The circuit court then reviewed on the record each of the required statutory factors under WIS. STAT. § 48.426(3). The court dismissed the idea of a guardianship with the foster parents because it would not provide stability for J.W, Jr. The court stated, "what he doesn't need is to be on the roller coaster. He needs a solid foundation to navigate whatever … challenges" might arise in the future. Finally, the court ordered the termination of Q.M. and J.W.'s parental rights.

¶16 J.W. appeals.

## DISCUSSION

¶17 Wisconsin employs a two phase procedure to determine the outcome of a petition for involuntary TPR. *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the first phase, the petitioner must show by clear and convincing evidence that the grounds enumerated in the petition exist. WIS. STAT. §§ 48.415, 48.424. If grounds are found to exist, then the court proceeds to

the second phase, in which the court determines the disposition of the TPR petition. WIS. STAT. § 48.427. During the dispositional hearing, the court considers whether termination is in the best interests of the child and must consider on the record at least the six factors provided in WIS. STAT. § 48.426(3). *See State v. Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475.

¶18  J.W. makes two arguments on appeal. With regard to the grounds phase, he contends that the circuit court's findings were clearly erroneous and that he should not be found unfit based on either ground. With regard to the dispositional phase, he asserts that the evidence was insufficient to support the circuit court's conclusions that the TPR was in J.W., Jr.'s best interests.

I.    *Grounds phase*

¶19  During phase one, a parent may choose to have a jury determine whether the grounds alleged in the TPR petition exist. WIS. STAT. § 48.427(3). "Due to the severe nature of terminations of parental rights, termination proceedings require heightened legal safeguards against erroneous decisions." *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶21, 246 Wis. 2d 1, 629 N.W.2d 768. "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." *St. Crois Cnty DHHS v. Matthew D.*, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. We review the evidence in the light most favorable to the verdict. *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶39, 333 Wis. 2d 273, 797 N.W.2d 854. Whether the evidence was sufficient is a question of a law we review independently. *Id.*, ¶17.

### A. *Continuing CHIPS*

¶20 The jury found that the continuing CHIPS ground, set forth in WIS. STAT. § 48.415(2), existed. To prove this ground, the petitioner had to prove three issues. First, "[t]hat the child has been adjudged to be a child … in need of protection or services and placed, or continued in a placement, outside his or her home" under certain statutory court orders. Sec. 48.415(2)(a)1. Second, that the agency responsible for the child "made a reasonable effort to provide the services ordered by the court." Sec. 48.415(2)(a)2.b. Reasonable efforts are defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child … the level of cooperation of the parent … and other relevant circumstances of the case." Sec. 48.415(2)(a)2.a. Third, that "the child has been placed outside the home for a cumulative total period of [six] months or longer" pursuant to a relevant court order; "that the parent has failed to meet the conditions established for the safe return of the child to the home;" and, that there is a "substantial likelihood that the parent will not meet those conditions" by the time the child will have been placed outside of the home for fifteen of the most recent twenty-two months, in the case that "the child has been placed outside the home for less than [fifteen] of the most recent [twenty-two] months. Sec. 48.415(2)(a)3.

¶21 Our examination of the record shows that there was credible evidence presented to the jury to support the three elements of this ground. During the case manager's testimony, she reviewed the dispositional order, which satisfied the first element as a statutory order for CHIPS, under WIS. STAT. § 48.345, and included the required notice of parental rights. The case manager testified about the services offered by her agency and the reasonable effort made

to assist J.W. in meeting the conditions of return. Therefore, there is credible evidence of the second element.

¶22 For the third element, the record reflects that the TPR petition was filed in March 2021, which was more than six months after J.W., Jr., was placed outside of the home in January 2020. By the time of the trial, he had been out of the home for more than fifteen months out of the most recent twenty-two months. The case manager testified that J.W. did not satisfy the conditions of return in the dispositional order. The case manager did not see the behavioral change necessary to satisfy the conditions—he did not show an understanding of the impact of Q.M.'s drug and alcohol addiction and the need to intervene to protect J.W., Jr. from Q.M.'s inattentive—and suspected drug-based—behavior during visitation. He minimized or denied any real history of domestic violence in the home and failed to acknowledge any impact on J.W., Jr. He stayed in a relationship with Q.M. despite the domestic violence and alcohol and other drug abuse (AODA) concerns and even suggested Q.M. could still provide care for J.W., Jr. while he worked—which demonstrated he did not appreciate the problem with putting his own needs before those of his son. She testified he failed to control his temper and emotions, as demonstrated by a phone call with the visitation supervisor in which he swore harshly. This testimony provides credible evidence to satisfy the third element. Accordingly, there is credible evidence to sustain the jury's verdict that the continuing CHIPS ground existed and we do not disturb that finding. It is not clearly erroneous.

¶23 J.W. contends that DMCPS failed to "take[] into consideration the characteristics of the parent" as required by WIS. STAT. § 48.415(2). J.W. argues that he was not a "video or phone person"; therefore, it was reasonable that he refused to participate in virtual visits with J.W., Jr., which were necessary during

the early stages of the COVID-19 pandemic. We reject this argument. A parent not liking to use the phone or video is not a "characteristic of the person."

¶24 J.W. contends that he made a conscientious effort to complete the court ordered services and make the required behavioral changes beginning in January 2021. He argues he has completed the required parenting classes, the psychological evaluation and the domestic violence classes, even if he was unable to begin the recommended individual therapy due to a waiting list. The record reflects that the case manager testified that his delay in starting services—nearly a year after J.W., Jr. was removed and over six months after the dispositional order was entered—diminished his opportunities to make the behavioral changes required by the dispositional order and might have allowed for him to receive individual therapy. Satisfying the conditions is more than "checking the boxes" to complete services. We conclude J.W.'s argument does not undermine the validity of the jury's findings that the continuing CHIPS ground existed.

### B. Failure to assume parental responsibility

¶25 The jury also found that the failure to assume parental responsibility ground, set forth in WIS. STAT. § 48.415(6), existed. To provide this ground exists, the petitioner must prove that the parent does not have a substantial parental relationship with the child. Sec. 48.415(6)(a). In this context, a "'substantial parental relationship' means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). The factors the court considers includes expressing concern for the "support, care or well-being of the child" and, for putative fathers, whether the person expressed concern for the "support, care, or well-being of the mother during her pregnancy." *Id.*

11

¶26    J.W. argues that he has demonstrated support for J.W., Jr. by paying child support, buying necessary items for his son, maintaining communication with his foster parents, and visiting his son for eight hours weekly. We agree that these may indicate an attempt to assume parental responsibility. However, there was ample evidence in the record to support the jury's finding that this ground existed. The case manager testified that although J.W. signed consents for treatment, J.W. did not attend any medical appointments, ask about his son's health, or ask about his son's experience in day care. J.W. expressed a great deal of love and interest in his son during his testimony; however, he was unaware of his child's healthcare providers, day care, or the last name of his foster parents. J.W. testified that he did not provide daily supervision and care for any of his nine children, including J.W., Jr. The case manager acknowledged in her testimony that J.W. cared for his son and they had a positive relationship, but ultimately, his failure to understand the impact of domestic violence and Q.M.'s drug use on J.W., Jr. showed a lack of protective instinct over his son. This is credible evidence of his failure to assume parental responsibility. Therefore, we conclude that jury's verdicts that the ground existed were not clearly erroneous. Further, we conclude that the circuit court did not err when it found J.W. an unfit parent, in accord with the statute which requires that finding when the grounds are proven to exist. *See* WIS. STAT. § 48.424(4).

## II.    *Dispositional phase*

¶27    J.W. contends that the evidence adduced at the dispositional hearing does not support the court's findings that termination was in J.W., Jr.'s best interests. He highlights that the evidence showed that J.W. maintains his love for J.W., Jr. He pays child support and he provided for J.W., Jr., by buying shoes, clothing, baby toys, baby wipes, car seats and strollers.

¶28 Ultimately, the decision to terminate parental rights is within the discretion of the circuit court. *See Gerald O. v. Susan R.,* 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach. *Dane Cnty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶29 J.W. does not challenge the circuit court's findings on the six statutory factors discussed during the dispositional hearing. Instead, we interpret him to ask us to weigh the factors differently than the circuit court did. The determination of whether termination of parental rights is in the best interests of the child is governed by the statutory process in ch. 48 and the factors under section 48.426(3). "The decision whether to terminate a parent's rights to a child can be one of the most wrenching and agonizing in the law." *Sheboygan County HHS v. Julie A.B.*, 2002 WI 95, ¶29, 255 Wis. 2d 170, 648 N.W.2d 402. We defer to the circuit court as to the weight of each factor when the court properly examined each factor on the record. *Margaret H.*, 234 Wis. 2d 606, ¶29. Here, the record shows that the circuit court examined each factor and considered the best interests of J.W., Jr. when it terminated J.W.'s parental rights. It is our task to search for evidence to support the trial court findings, "not for evidence to support findings the trial court could have reached but did not." *Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166. Although we join the circuit court in recognizing that J.W. cares deeply for his son, there are sufficient facts in the record to support the circuit court's findings and we agree with its conclusion.

No. 2022AP1338

¶30 We conclude that in determining whether the TPR was in J.W., Jr.'s best interests, the circuit court considered the relevant facts, applied the proper standard of law, and demonstrated rational decision making, reaching a conclusion that a reasonable court could reach. *Mable K.*, 346 Wis. 2d 396, ¶39. Accordingly, we conclude the court's exercise of discretion was not erroneous.

## CONCLUSION

¶31 For the reasons stated above, we affirm the TPR order.

*By the Court.*—Order affirmed.

This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

14