COURT OF APPEALS
DECISION
DATED AND FILED

November 28, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2023AP1510**

STATE OF WISCONSIN

Cir. Ct. No. 2022TP138

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M. E. E., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

  PETITIONER-RESPONDENT,

  V.

M. E. E.,

  RESPONDENT-APPELLANT.

  APPEAL from an order of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1     WHITE, J.[1]  M.E.E. (Michael) appeals the order terminating his parental rights to his daughter, M.D. (Mary).[2]  Michael argues that the there was insufficient evidence to support the jury's verdicts that grounds existed to terminate his parental rights.  He further argues that the circuit court erroneously exercised its discretion in the dispositional phase when it ordered the termination of his parental rights.  Upon review, we reject Michael's arguments and we affirm.

## BACKGROUND

¶2     Mary was born in November 2020.  At the hospital, Mary's mother, Parker, had significant mental health issues, drug use during pregnancy, and showed an inability to care for Mary.[3]  The Division of Milwaukee Child Protective Services (DMCPS) detained Mary and she has remained in foster care, staying in the same home from three weeks old though the pendency of this case.  Michael was alleged to be Mary's father at the hospital; however, DMCPS had safety concerns about Michael due to criminal history and Parker's fear of him.  After his paternity was confirmed by DNA testing, Michael had supervised visitation with Mary.

¶3     Mary was found to be a child in need of protection or services (CHIPS) in July 2022 and a dispositional order was entered.  Michael's conditions

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.  On this court's own motion, we are extending the deadline in WIS. STAT. RULE 809.107(6)(e) for releasing this opinion by seven days to November 28, 2023.

[2]  We refer to the family in this matter by pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

[3]  Parker's parental rights were also terminated and there is no case on appeal before us.

of return included: do not allow violence in your home or in front of your child, always supervise your child and place her needs before your own, keep a safe, clean home, and provide safe care for your child. The court ordered DMCPS to make reasonable effort to provide the following services to Michael: a protective capacity family assessment and recommended services, anger management, individual therapy, AODA assessment and follow-through with recommended treatment, psychological evaluation and follow-through with recommended treatment, and domestic violence classes. The court ordered Michael to attend and successfully participate in services provided by DMCPS and to cooperate with the agency managing the case and DMCPS.

¶4 The State filed the petition for termination of parental rights (TPR) of Michael in August 2022, alleging as grounds for the TPR that Michael had failed to assume parental responsibility for Mary. The State filed an amendment to that petition in February 2023, adding continuing CHIPS as a second ground for the TPR. During a jury trial in April 2023, the jury found that both alleged grounds existed and the court found Michael unfit. After the dispositional hearing, the circuit court concluded that termination of Michael's parental rights was in Mary's best interests and granted the State's petition. We discuss the jury trial and the dispositional hearing in depth below.

¶5 Michael appeals.

**DISCUSSION**

¶6 Termination of parental rights is governed by the Wisconsin Children's Code. The first stage is whether the grounds for the TPR exist, typically determined in a fact-finding hearing pursuant to WIS. STAT. § 48.424. The State has the burden to show that grounds for termination exist by clear and

convincing evidence. ***Evelyn C.R. v. Tykila S.***, 2001 WI 110, ¶22, 246 Wis. 2d 1, 629 N.W.2d 768. The second step is the dispositional phase, in which the circuit court decides whether the evidence warrants the termination of parental rights and if the termination is in the best interests of the child. ***Id.***, ¶23. "The ultimate determination of whether to terminate parental rights is discretionary with the circuit court." ***State v Margaret H.,*** 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.

¶7 Michael argues that the TPR was granted in error in both phases of the proceedings. He asserts that the State failed to prove all elements of each ground in the TPR; therefore, there was insufficient evidence in the record to support the jury's verdicts for continuing CHIPS and failure to assume parental responsibility. Second, he contends that the circuit court erroneously exercised its discretion when it determined that termination was in Mary's best interests in the dispositional phase. He argues that there is no support in the record for the court's findings. We reject each of Michael's arguments and address them in turn.

### I.  *Sufficiency of the evidence in the grounds phase*

¶8 During the first phase, a parent may choose to have a jury determine whether the grounds alleged in the TPR petition exist. WIS. STAT. § 48.427(3). "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." ***St. Croix Cnty. DHHS v. Matthew D.***, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. We review the evidence in the light most favorable to the verdict. ***Tammy W-G. v. Jacob T.***, 2011 WI 30, ¶39, 333 Wis. 2d 273, 797 N.W.2d 854. Whether the evidence was sufficient is a question of a law we review independently. ***Id.***, ¶17.

### A. Continuing CHIPS

¶9     The jury found that the continuing CHIPS ground, set forth in WIS. STAT. § 48.415(2), existed.  We recite from the circuit court's instructions to the jury.  To prove this ground, the State had to prove four elements "by evidence that is clear, satisfactory and convincing to a reasonable certainty" that Mary is a child continuing to be in need of protection or services.  The first element was not in dispute:  Mary was "adjudged to be a child in need of protection or services and was placed outside of the home of [Michael] for a cumulative period of six months or longer pursuant to one or more court orders containing the termination of parental rights notice required by law."

¶10     Second, the State must prove that DMCPS "made a reasonable effort to provide the services ordered by the [c]ourt."  It explained that a "reasonable effort means an earnest and conscientious effort to take good faith steps to provide those services taking into consideration the characteristics of the parent or child, the level cooperation of the parent and other relevant circumstances of the case."  The court instructed the jurors that they "may consider all evidence bearing on that question including evidence of events occurring since the filing of the petition[.]"

¶11     Third, the State must prove that Michael has "failed to meet the conditions established for the safe return of the child to the home."  For that question, the jurors were instructed to "consider the facts and circumstances as they existed" on the date the amended petition was filed.

¶12     Fourth, the State must prove "that there is a substantial likelihood that [Michael] will not meet the conditions for the safe return of [Mary] to his home by" the timeline set in the TPR statutes.  The jurors were instructed that they may "may consider all evidence bearing on that question, including evidence of

events and conduct that has occurred since the filing" of the amended petition. The court further stated that the jurors "may consider the following, the length of time [Mary] has been placed outside of the home, the number of times [Mary] has been removed from the home, the parent's performance in meeting the conditions for return of the child and the parent's cooperation with the social services agency[.]"

¶13 Our examination of the record shows that there was credible evidence presented to the jury to support the four elements of this ground. We turn to the record. The State presented the testimony of the initial assessment specialist (IAS) from DMCPS, the prior case manager who worked with the family starting in October 2021, the ongoing case manager (OCM) who worked with the family after May 2022, and the foster mother. Michael testified in his own defense, and called his therapist for individual therapy, and a parenting visitation supervisor.

¶14 The prior case manager, the OCM, and the foster mother's testimony each showed that Mary was a medically complex child with developmental and cognitive delays who was receiving services for feeding, occupational therapy (OT), physical therapy (PT), ear infections, speech therapy, and autism. The prior case manager testified that from the beginning, Mary "was not gaining weight properly" and she was spitting up, refusing bottles, and having issues with feeding at daycare. The foster mother testified that Mary began refusing bottles at about four-to-five months and Mary was referred to a gastroenterology clinic for a feeding specialist team at nine months. The foster mother stated that Mary would not eat at daycare, and she had to leave work to feed Mary. Mary needed OT and PT due to delays, including needing leg braces to learn to walk, which she finally achieved at nineteen months. At Mary's eighteen month medical appointment, she

was screened as positive for autism and she had a diagnostic evaluation with Wisconsin Early Autism Project, which diagnosed her with level three autism. The OCM testified that Mary had very limited speech skills. She spins, spits, and flaps her hands.

¶15     With the first element not in dispute, we turn to the second element of the continuing CHIPS allegation, and we conclude there was credible evidence that the State made a reasonable effort to provide court-ordered services to Michael. The OCM testified that Michael completed a parenting assessment, anger management, individual therapy, and two AODA screening tests. The OCM stated that Michael completed part of the psychological evaluation, although Michael's own testimony showed he had not completed the psychological evaluation and he was still in domestic violence classes. Our examination of the record shows that these services were included in the dispositional order. DMCPS also provides supervised visitation for Michael. The prior case manager testified that Michael's home was evaluated and found suitable for in-home visits. The OCM testified that Michael had twelve hours of supervised visitation each week at the time of trial, a number that was triple the number of hours he had in March 2021.

¶16     Similarly, there is credible evidence to support the jury's finding that the State proved the third and fourth elements of continuing CHIPS. The record reflects that Michael was not cooperative with the State's efforts and he had not met the conditions of return by the date the amended petition was filed and he would not meet those conditions within the timelines set in the petition by statute.

¶17     The record reflects that DMCPS had concerns about Michael's care for Mary from initial intake. The IAS testified that she responded to the hospital's

report that Parker was not able to care for the newborn, due to hallucinations, PTSD, previous sex trafficking, and drug concerns. Parker identified Michael as the father; however, the IAS became concerned because Parked was fearful of Michael, he was the payee of Parker's benefits, and Parker seemed vulnerable.

¶18 Additionally, the record reflects that Michael's participation beyond visitation was limited. The foster mother testified that Mary was almost two and one-half years old and she had attended "[p]robably over a hundred" medical appointments and that Michael had attended "[s]ix or seven." The foster mother testified that she would not understand how to work with Mary if she did not attend the appointments. The foster mother testified that she duplicated the exercises that Mary learned in OT and PT every day at home to build her skills.

¶19 Our examination of the record supports that the agency and the foster mother had concerns about Michael's responses and understanding of her needs. Although the case manager, OCM, and foster mother testified to the many feeding problems that Mary had, Michael believed the problems were limited to daycare and she would outgrow the issue. The foster mother testified that when Mary was thirteen to fifteen months old, she had diaper blowouts and vomiting after eating smoothies prepared by Michael during his visitation. Although Michael was informed of the problem, he persisted in giving Mary smoothies until a doctor directly told him to stop giving her smoothies. The OCM testified that Michael challenged the doctor about Mary's feeding during the medical appointments he attended. During this time, Mary was losing weight and the foster mother had to take her for additional weight checks.

¶20 The record reflects concerns in areas other than feeding. The OCM testified that Michael told her that he was not aware Mary had issues walking, that

Mary did not fall at his house, and that he did not have her use the leg braces at his house. The foster mother testified that Michael cancelled a surgery for Mary to receive ear tubes for repeated infections recommended by the ENT when she was about a year old.[4]

¶21 The foster mother testified that while Michael attended the eighteen month checkup where autism was flagged, he expressed that he did not know what autism was. The OCM testified that Michael was given five months notice to attend Mary's full autism evaluation, but he did not attend. The OCM opined that Michael did "not have the skill, the knowledge or the motivation to understand what autism is." Michael has not raised any concerns to the OCM about Mary.[5]

¶22 The record reflects that Michael's cooperation with the services and conditions of return was limited. The prior case manager testified that Michael responded to emails about the case, but he made it clear he did not want a referral to services and he was "not willing to engage in these services." The case

---

[4] We note that Michael eventually consented to the rescheduled surgery.

[5] During Michael's testimony, he stated that he knew Mary was "level 3 autistic and she has linguistic barriers, cognitive barriers[.]" The State confronted Michael with his deposition testimony that Mary would outgrow her autism, which he responded to by testifying that he understood that "people that have autism are very successful today" and he did not "want autism to be a barrier for her, to be a productive adult or growing up[.]"

manager testified that when he met Michael, he "appeared very frustrated with the system," he was "very agitated," and he "raised his voice very frequently."[6]

¶23 The prior case manager testified that when evaluating whether Michael completed the conditions to return Mary to his case in the dispositional order, the agency was "looking for behavioral change." The case manager explained that attending a parenting class without retaining information will not lead to a sustainable long-term behavior change. The case manager also stated that the agency looked at the "whole picture" of the case and considered Michael's open and unresolved criminal charges.[7] Similarly, the OCM testified that Michael had to make behavioral changes to satisfy the conditions in the dispositional order, not fulfill a checklist of programs he attended. The OCM stated that behavioral changes would be accepting referrals to a class or service, applying the information learned in the class, and showing the behavioral change after completion of that service.

¶24 Moreover, in Michael's own testimony, he stated that he did not participate in programming offered by DMCPS until after the dispositional order was entered in July 2022. The record reflects that Mary was about twenty-one

---

[6] The prior case manager testified that he was concerned by Michael's behavior, which included refusing to speak to the case manager, having "a lot of cameras" in his home, and wearing "a chest camera as well." He stated that Michael told him that he was recording everything. Because Michael was exhibiting "questionable behavior," the case manager thought that it would be beneficial for Michael to have a "mental health assessment … to rule out any potential undiagnosed mental health concerns." The prior case manager worked with the family prior to the dispositional order being entered, after which Michael did consent to a psychological evaluation, which was not completed by the time of the trial.

[7] The OCM also testified that it was difficult to attempt long-range planning for Mary because Michael had not resolved his pending criminal cases in multiple counties. The OCM testified that she was concerned that Michael was charged with driving without a license, but he drove to the trial.

months old at the time the dispositional order was entered, and she had never been in Michael's care. Michael testified that he understood the programming to be optional before the dispositional order and that he could not understand why DMCPS wanted him to do classes.

¶25 The OCM testified that Michael was not cooperative, which was a condition of the dispositional order. Even after the order was entered, Michael refused to meet outside of his home, refused to provide his insurance information for Mary's services, he refused to have supervised visitation in the OCM's office when there was no visitation supervisor available. The OCM testified that Michael was notified by email and certified mail about doctor's appointments, but he still regularly complained he was not given notice. She stated that no other family she worked with needed certified mail.

¶26 Further, the OCM testified that she had to verify Michael's statements. During the medical care related to Mary's feeing and weight loss, the foster mother testified that the doctor wanted Mary to have soy milk. The foster mother and the OCM testified that Michael repeatedly gave Mary almond milk. The OCM testified that Michael told her that the nurse told him it was similar to water. However, when the OCM called the nurse, she said that was not what she told Michael.

¶27 Although we acknowledge that Michael participated in many of the required classes and programming set forth in the dispositional order, the record reflects credible evidence establishing that he failed to meet all of the conditions, he failed to cooperate with the process, and he failed to fulfill the behavioral change required. Therefore, we conclude there was credible evidence to support

the jury's verdict that all elements of the continuing CHIPS ground were proven. *See* **Michael D.**, 368 Wis. 2d 170, ¶40.

### B. Failure to assume parental responsibility

¶28 As a second ground for the TPR, the jury found that failure to assume parental responsibility, as set forth in WIS. STAT. § 48.415(6), existed. We again recite from the circuit court's instructions to the jury. To show this ground, the State "must prove by evidence that is clear, satisfactory and convincing to a reasonable certainty" that Michael "has not had a substantial parental relationship" with Mary. "The term substantial parental relationship means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of [Mary]." The jurors were instructed that a "substantial parental relationship is assessed based on the totality of the circumstances throughout the child's entire life."

¶29 The record reflects that Michael had twelve hours of visitation with Mary. The OCM testified that while his number of hours tripled during the case, he never progressed to partially supervised or unsupervised visitation. While the record reflects that none of Michael's visits with Mary had been cancelled due to his conduct, the OCM testified that Michael went a month and one-half without visitation with Mary when a visitation supervisor was unavailable to supervise at his home. Michael refused to use a visitation supervision service outside his home, even when the OCM found one eight minutes from his home.

¶30 The OCM testified that Michael has not learned about Mary's PT exercises, OT exercises, the feeding team and feeding issues, or speech therapy. The OCM testified that Michael has not paid child support or provided health insurance for Mary. Michael testified that he provided clothing, toys, and books

for Mary at his home; however, the OCM testified that Michael did not provide any of those for Mary in her foster placement.

¶31  Although Michael's testimony shows a long-term desire to parent Mary, the testimony from the OCM and the foster mother show that Michael did not raise concerns about Mary's development or make requests for information about Mary when she was not in his home. We conclude that there was credible evidence in the record to support the jury's verdict that the failure to assume parental responsibility ground was proven. *See **Michael D.***, 368 Wis. 2d 170, ¶40. Ultimately, we conclude that Michael's challenge to the sufficiency of the evidence in the grounds phase of the TPR proceeding fails.

## II.  *Dispositional phase*

¶32  Michael argues that the circuit court erroneously exercised its discretion when it terminated his parental rights. He asserts that the circuit court did not focus on the statutory considerations required but instead focused on his "odd beliefs."

¶33  During the dispositional phase, the circuit court ultimately exercises its discretion to determine whether termination is in the best interests of the child. ***Margaret H.***, 234 Wis. 2d 606, ¶27. The circuit court is required to consider at least the six factors for consideration in WIS. STAT. § 48.426(3).[8]  "[T]he record

---

[8] In determining the disposition of a TPR petition, the circuit court must consider, but is not limited to, the following six factors:

(a) The likelihood of the child's adoption after termination.

(b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

(continued)

should reflect adequate consideration of and weight to each factor." ***Margaret H.***, 234 Wis. 2d 606, ¶35. We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." ***Dane County DHS v. Mable K.***, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶34 We return to the record. The State called the OCM and the foster mother. Michael testified on his own behalf. After Michael was questioned about his choice and belief that he could rescind his driver's license, but still drive, the court had the following exchange with Michael:

> THE COURT: Do you agree that when you don't have a license and you drive a car that you are breaking the law?
>
> THE WITNESS: You break the statute. I understand that.
>
> THE COURT: A statute is a law.
>
> THE WITNESS: Okay. Well, I agree to disagree there are laws.

---

(c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

THE COURT: The statutes –

THE WITNESS: There are policies. I understand what you're saying.

THE COURT: Policies?

THE WITNESS: Yes, I understand what you're saying but policies have to be followed sometimes.

THE COURT: I'm trying to understand what you're saying. Statutes are not laws they are policies?

THE WITNESS: The constitution is laws. I look at the constitution, the United States Constitution is the law of the land and everything under that and then people have department statutes that have to be followed that's to support the law, that statute should support the law. That's what my understanding is about the law, statutes support the law. They are not laws but they support the law.

¶35 The court expressly addressed that it could really not "care less if [Michael] wants to drive a car without a driver's license. He runs the risk of getting arrested and that's on him. [The court was] not holding that against him as far as [its] decision today." The court noted that it engaged in the conversation with Michael to understand his "belief system" that is, were "you aware of the fact that there are consequences because of the decisions that you make, what you teach your children, how do you want them to act in society and how do you want the rest us of to act as well[.]"

¶36 The court stated that it was required by the statutes to consider factors under WIS. STAT. § 48.426(3) in its overarching determination of the best interests of the child. The court stated that its focus was "[t]he best interest of the child, not the best interest of the State, not the best interest of the guardian ad litem, not the best interest of the parents but the best interest of the child[.]"

¶37    The court's ruling began with the sixth factor, whether Mary would be able to enter into more stable relationships if the TPR were granted. The court considered that Michael had not met the conditions in the underlying CHIPS case, which meant that if the TPR petition were dismissed, Mary would "continue to be under a CHIPS order" and it has been almost two and one-half years. The court asked "how much longer is she supposed to wait?" The court stated that the "real issue is about stability and the daily day-to-day life routine which is a must for this child."

¶38    The court acknowledged that Michael asked him to understand that he could maintain and attend Mary's appointment schedule. However, the court noted that Michael attended another daughter's appointments without fail during this time, while he missed ninety percent of Mary's appointments, with an estimate of Mary having 100 appointments and Michael attending ten. The court addressed Michael's statements that it was the foster mother's responsibility to communicate with him, which the court disagreed with and stated that "[i]f you want [Mary] back, it's your responsibility." The court noted that while Michael regularly participated in supervised visitation with Mary, he never graduated to partially or fully unsupervised visitation in almost two and one-half years. The court concluded that Mary would languish in foster care if the TPR were not granted.

¶39    The court then addressed the first five factors. The court concluded that there was "a strong likelihood of adoption if the TPR is granted. [The foster mother] is committed to adopting [Mary]." The court found there was no barrier to adoption "because of her age or health particularly since [the foster mother] has found a way to meet [Mary's] needs and wishes." The court considered Mary to be "adoptable despite the fact that this child has behavioral issues the caregiver is

committed to meeting those issues and despite the fact that the child has developmental issues such as autism and cognitive delays, speech delays and feeding issues those shortcomings have been met by [the foster mother.]"

¶40     The court considered that there was "not a substantial relationship with either the mother or the father."  The court noted that while Mary visited Michael "on a regular basis," he did "a minimum amount of care" and "never graduated … to unsupervised visits or partially supervised visits … to a point where he would have full responsibility and care[.]"  The court was mindful of Mary's needs, "particularly with autism, level 3 autism and she has a number of doctor's appointments that are required and that will be required going forward."  Further, the court concluded that there was no evidence that Mary had "a relationship with any maternal or paternal family members or relatives."  Finally, the court concluded it would "not be harmful to the child to sever those relationships[.]"

¶41     The court considered Mary "too young to really express to [the court] about her wishes about placement[.]"  The court calculated the "duration of separation of the child from the parents" to be twenty-eight or twenty-nine months, "a long time."  The court noted that Mary has been out of her parents' care on "a permanent basis."  Having begun with the final factor, the court ultimately concluded that "in light of the best interest of the child standard," both parents' rights to Mary were terminated.

¶42     Michael argues that the circuit court did not take into account his efforts throughout the case.  He asserts that the court ignored the bond that Mary had with his daughter who lived in his home.  Michael argues he raised several other children and step-children without intervention by the child welfare system.

Michael contends that he has educated himself about Mary's autism and medical needs.

¶43    Michael does not challenge the circuit court's individual findings on the six statutory factors discussed during the dispositional hearing. Instead, we interpret him to ask us to weigh the factors differently than the circuit court did. We defer to the circuit court as to the weight of each factor when the court properly examined each factor on the record. *Margaret H.*, 234 Wis. 2d 606, ¶29. Here, the record shows that the circuit court examined each factor and considered the best interests of Mary when it terminated Michael's parental rights. The court's analysis looked at how denying the TPR at this stage would leave Mary to languish in foster care because Michael was not in the position to meet the conditions to end the underlying CHIPS case. Although Michael points to facts that support his parenting and Mary's connection to him, it is our task to search for evidence to support the trial court findings, "not for evidence to support findings the trial court could have reached but did not." *Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166.

¶44    Further, although the record reflects that the circuit court engaged Michael in his beliefs about his driver's license and the rule of law, the court expressly stated that it was not holding Michael's decision to drive without a license against him in the TPR disposition. The court did stated that it wanted to understand Michael's "belief system" and how it intersected with his belief in consequences and raising children. The statutory considerations do not limit the court to only those six factors, and we conclude that the court's considerations of Michael's beliefs as relevant to Mary's best interests is not an erroneous exercise of discretion.

¶45 We conclude that in determining whether the TPR was in Mary's best interests, the circuit court considered the relevant facts, applied the proper standard of law, and demonstrated rational decision making, reaching a conclusion that a reasonable court could reach. *Mable K.*, 346 Wis. 2d 396, ¶39. Accordingly, we conclude its exercise of discretion was not erroneous.

## CONCLUSION

¶46 For the reasons stated above, we conclude that there was sufficient, credible evidence in the record to support the jury's verdicts in the grounds phase of the TPR trial. Further, we conclude that the circuit court's decision to terminate Michael's parental rights to his daughter Mary was not an erroneous exercise of discretion.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.