**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 12, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2023AP1699
2023AP1702
2023AP1703
2023AP1704
2023AP1705**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2021TP265
2021TP264
2021TP263
2021TP262
2021TP261

**IN COURT OF APPEALS
DISTRICT I**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO I. B., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

S. F.,

      RESPONDENT-APPELLANT.

---

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M. B., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

    V.

S. F.,

       RESPONDENT-APPELLANT.

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C. W., JR., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

    V.

S. F.,

       RESPONDENT-APPELLANT.

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO K. W., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**S. F.,**

       **RESPONDENT-APPELLANT.**

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO K. W., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**S. F.,**

       **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1     WHITE, J.[1] Sabrina appeals from the orders terminating her parental rights to her children: Kendra, Kyanna, Cameron, Michael, and Ivan.[2] Sabrina argues that the State did not prove each element in either ground alleged to terminate her parental rights; therefore, there was insufficient evidence to support the court's finding that Sabrina was an unfit parent. Additionally, she argues that the circuit court erroneously exercised its discretion in the dispositional phase when it ordered the termination of her parental rights. Upon review, we reject Sabrina's arguments and we affirm.

## BACKGROUND

¶2     Sabrina is the mother of Kendra, born in June 2009, Kyanna, born in March 2015, Cameron, born in May 2016, Michael, born in February 2018, and Ivan, born in July 2019.[3] The Division of Milwaukee Child Protective Services (DMCPS) received twelve referrals concerning Sabrina and her children since 2009. After multiple referrals in 2019 and 2020, which alleged physical abuse, neglect, and failure to seek medical care, DMCPS detained the children in February 2020. The children remained in out-of-home care through the pendency of these cases.

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. These appeals are consolidated.

[2] We refer to the family in this matter by pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

[3] Kendra, Kyanna, and Cameron's father died in 2017. Michael and Ivan's father, Mike, also had his rights terminated in these cases; however, his cases are not before this court.

4

¶3    In February 2020, the State filed petitions that the children were in need of protection or services (CHIPS).[4]  The circuit court entered dispositional orders in October 2020 after a hearing.  Sabrina's conditions to return her children to her care in the dispositional order included:  control your mental health, commit no crimes, always supervise your children and place your children's need before your own, control your emotion with a focus on physical abuse, keep a safe, clean home, meet your children's special needs, meet your children's medical needs, and provide safe care for your children.  The court ordered DMCPS to provide parenting services, a parenting aide, parenting classes, visitation services, anger management, and a psychological evaluation and any resulting recommendations.

¶4    The State filed petitions for termination of parental rights (TPR) against Sabrina for all five children in December 2021.  It alleged two grounds: continuing CHIPS and failure to assume parental responsibility.  Sabrina waived her right to a jury trial and a court trial was held on the grounds in March 2023.

¶5    The State's case began with the DMCPS initial assessment supervisor (IAS), who testified about the referrals of concern about Sabrina's children made in 2019.  The IAS testified that DMCPS's initial plan was to provide intensive in-home services to "provide support for both parents and help them keep a schedule and get the children back on medical appointments and referrals and get them caught up developmentally plus physically."  However, she explained that DMCPS's plan could not happen because the parents were

---

[4] "CHIPS is the commonly used acronym to denote the phrase 'child in need of protection or services' as used in the Wisconsin Children's Code, chapter 48, Stats." *Marinette Cnty. v. Tammy C.*, 219 Wis. 2d 206, 208 n.1, 579 N.W.2d 635 (1998).

combative; they expressed that nothing was wrong with the children, and they were unwilling to work with DMCPS or a community agency.

¶6      The IAS testified that the concerns about the children included global developmental delays, speech delays, dental issues, lazy eye, ear infections, high lead levels, and lack of medical care and follow-up.  In February 2020, the IAS detained the children.  Michael was not detained until the temporary physical custody hearing when the parents were arrested for disorderly conduct to trying to stop the IAS from detaining him.  The IAS stated that the parents had made threats against an initial assessment specialist including death threats and the parents were belligerent, which prompted the police to accompany the DMCPS workers.

¶7      The State next called Sabrina, who testified that the case manager arranged supervised visitation beginning in June 2020, and that she was referred for a parenting class, a parenting aide, anger management, and psychological evaluation.  She did not remember Mike threatening to kill the social worker and take the children and she considered him a safe person to be around the children.  She never progressed to partially supervised or unsupervised visitation.

¶8      Sabrina testified she never used physical discipline and the children had so many marks because they "play[ed] rough."  She knew that Kendra had an Individual Education Plan (IEP) for speech delays and learning disabilities and she had cognitive delays and behavioral problems.  She did not remember Kendra's school attendance issues, including allegations of missing 28% of the days in 2018.  Sabrina stated that Kendra had a lazy eye, but Sabrina did not think Kendra had been prescribed glasses.  While she took Kendra to Birth-to-Three, she "never got around" to taking the other four children.

¶9    Sabrina testified that Cameron and Kendra were diagnosed with neurofibromatosis, which was a condition that caused learning disabilities and affected motor skills for the children, as well as being a condition their father had. Sabrina testified that Kyanna was developmentally on track and did not have learning disabilities. She stated that she knew Kyanna was seeing a therapist, but she did not think Kyanna had anxiety. Sabrina did not believe that Michael's autism diagnosis was correct. She did not think they should be monitoring Michael for ADHD. She testified that Ivan was small at the time he was detained because babies "can't gain weight because their stomachs are small" and he "puked up his bottles[.]"[5]   She stated that Ivan now stutters and has a speech delay. Sabrina testified that she has not attended any doctor's appointments since the children were removed. She stated that she is a nurturing mother: "I celebrate their birthdays. I show them a lot of love. I give hugs. I give them kisses … I play games with them" and "[w]e talk to each other[.]"

¶10    The State called the ongoing case manager, who worked for the agency managing the child welfare cases, and who testified that she had worked with the family since June 2020. The case manager testified that when she discussed the removal of the children with the parents, "[t]hey would state that it was the kids that hit each, other people were lying on them … they were good parents and didn't deserve to have the kids removed."

---

[5] The IAS's testimony had been that at the time of removal, Ivan had "fallen off the growth chart" and gained minimal weight between ages two months and six months; where he was expected to weigh seventeen pounds, he only weighed thirteen pounds.

7

¶11     The case manager testified that Sabrina completed a parenting class, anger management class, and a psychological evaluation, though it took second referrals for Sabrina to complete some of the services. Although Sabrina participated in the psychological evaluation, she did not do follow up services with the recommended services for counseling and a psychiatric evaluation. The case manager testified that Sabrina stated she "would find her own providers for services."

¶12     The case manager testified about the visitation supervision provided for Sabrina. The family was discharged from two visitation supervision services, the first for lack of progress after nine months and the second due to disrespect and name calling. Sabrina progressed to in-home supervised visits for several months with the second and third service.

¶13     The case manager testified that Sabrina did not satisfy all of the conditions of return in the dispositional order. Sabrina did not control her mental health; although Sabrina was "diagnosed with bipolar disorder," she refused to take medication or admit she has a disorder.[6] She frequently cancelled visitation and did not always supervise her children and put her children's needed before her own. Sabrina did not control her emotions. Sabrina's only discipline during visitation was physical, and the visitation supervisors would need to step in when the parents got angry and the children escalated. Sabrina's struggles with

---

[6] We note that the record reflects that Sabrina was receiving disability benefits for bipolar disorder.

controlling her anger kept her from moving to partially supervised or unsupervised visitation.

¶14 The case manager testified that Sabrina was not able to meet the children's special needs. The case manager then provided details about the special needs for each child.

- Kendra "has an IEP for a significant development delay in school." Additionally, in school, she received speech therapy, had a one-on-one aid, participated in adapted physical education, and used more technology than her peers to be able to type. Kendra was in therapy weekly for trauma and anger, required constant supervision, lacked insight, and functioned as a much younger child. Medically, she also has neurofibromatosis, which requires annual appointment and MRIs to monitor for tumor growth.

- Kyanna was in weekly therapy due to trauma and very low self-esteem. She would get very frustrated when not able to complete something on her own; her therapy was also aimed at enhancing her coping skills.

- Cameron had "an IEP in school for significant developmental delay," which resulted in a one-on-one aide and sensory breaks. He had "a lot of behaviors at school including running out of the building and not following directions." Cameron was "in therapy to work on trauma and following directions from adults." Cameron also was diagnosed with neurofibromatosis.

- Michael had "an IEP for significant development delays." Michael was in speech therapy at school, had the services of a one-on-one aide, and different breaks. Michael was also in therapy as he struggled with transitions. Michael was diagnosed with autism and was receiving ABA therapy. He was also being monitored for ADHD.

- Ivan had an IEP and "significant developmental delays in school." He received speech therapy and other individualized services. Ivan also had to be monitored while eating for shoving excessive food in his mouth.

The case manager testified that although Sabrina was sometimes cooperative and was generally willing to sign consents, she had not accepted the children's diagnoses, attended medical or therapy appointments, implemented treatment programs, or participated in medication management.

¶15 The case manager testified that Sabrina satisfied the condition to commit no crimes. Further, her home was physically safe and appropriate as of December 2021, meaning she satisfied the condition to keep a safe and clean home. However, the case manager stated that there were safety concerns due to the parents' untreated mental health issues and anger management issues.

¶16 The case manager testified that since the children were detained in February 2020, Sabrina had "not provided the daily supervision, education, protection or care for these children." Sabrina had "not participated in medical care or education."

10

¶17     During cross-examination, the case manager testified that Sabrina's psychological evaluation showed that her intellect and emotions were impacted by her extremely deficient test scores in verbal comprehension, working memory, cognitive ability, and reading level.  The case manager explained that to accommodate Sabrina's needs, the case manager provided written information and gave her information multiple times.

¶18     After the State rested, Sabrina called her individual therapist; the psychologist who conducted the psychological evaluation and who also explained the how the cognitive deficiencies affected Sabrina; and Sabrina herself, who testified about her love for her children.

¶19     After reviewing the testimony and evidence, the court found that while there was no question that Sabrina loved her children, the family missed opportunities to work with DMCPS in their home and Sabrina's intellectual and learning disabilities impeded her understanding of what she needed to do.  The court found that Sabrina had not made the effort to change her behavior, and to work with the social workers to meet the conditions necessary for the safe return of the children.  The court found that at the time of removal, the "children were struggling with medical issues, dental issues, behavioral issues, mental health issues and special needs."

¶20     The court concluded that the State proved the first element of continuing CHIPS because "each child has been adjudged to be in need protection or services" and placed outside of the home "for a cumulative total period of six months or longer pursuant to one or more court orders containing the termination of parental rights notice."  The court concluded that the State proved the second

11

element that DMCPS made a reasonable effort to provide the court-ordered services in the dispositional order. The court acknowledged Sabrina's cognitive deficiencies, but did not know what more DMCPS and the agency could have done.

¶21 The court concluded that the State proved the third element that Sabrina "failed to meet the conditions established for the safe return of the children to the home" when considered against the date the TPRs were filed, or the date when children had been out of the home for fifteen of the last twenty-two months. The court found that Sabrina did not meet her children's medical needs and she did not understand or did not want to understand that the children had special needs. Sabrina did not make an effort to attend the children's appointments or to speak to the children's medical and dental providers despite the contact and appointment information being provided to her. The court found that while Sabrina had a safe, suitable, and stable home, her visitation "never progressed from supervised visits to unsupervised or overnight visits because she has not been able to demonstrate that she can care for the children in the home and keep them safe." The court found that she did not meet the condition to always supervise her children and place their needs before her own. The court found that the State proved that the continuing CHIPS ground existed.

¶22 Turning to the second ground for failure to assume parental responsibility, the court found that Sabrina did not accept the opportunities that were offered to "exercise significant responsibility for the daily supervision, education, protection and care of her children, all five children." Sabrina was unable to demonstrate that she established a relationship of caring for the children

12

on a daily basis or "focusing on their daily supervision, education, protection and care of the children[.]  The responsibility for the children has been managed by other people in the three years since the children were removed.  The court found that the State proved by "clear and convincing and satisfactory evidence" that Sabrina failed to assume parental responsibility.  Accordingly, the court found Sabrina to be unfit under both grounds in the TPR petition.

¶23    The case then moved to the dispositional phase, which was held in two days, with the children grouped by their fathers.  First, the June 1, 2023 hearing focused on Michael and Ivan's TPR petitions, children Sabrina shared with Mike.  The State called the foster parent for the boys, the case manager, and Sabrina testified on her own behalf.

¶24    In the court's oral ruling, it stated that it was "focused on what would be in the best interest of [Ivan and Michael]."  The court considered that the case was very sad because Sabrina lacked the "ability to cognitively function at a level that would allow her to be able to parent these … two boys."

¶25    The court considered the factors in WIS. STAT. § 48.426(3).[7]  First, it considered a strong "likelihood of adoption" for Ivan and Michael.  The foster

---

[7] In determining the disposition of a TPR petition, the circuit court must consider, but is not limited to, the following six factors:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

(continued)

13

parents had cared for the two brothers for the past two years, since May 2021, and they were committed to adopting the boys. Ivan was three years old and "adoptable" with no barriers "because of his health or the age." Michael was five years old, "adoptable," he had been in this foster placement for two years, he had an "intellectual disability," and he had been diagnosed as autistic. Ivan and Michael had been outside of the home since February 2020, so three years and three months, "a significant amount of time given" their young ages.

¶26 The court concluded that neither Ivan nor Michael had a substantial relationship with their mother because, while each child knew who Sabrina was, they only had a visitation relationship. The court found that "she has not been able to graduate from supervised visits to unsupervised visits" or overnight placements to demonstrate that she could care for the children on her own. The court found that the only substantial biological relationship the boys had was with each other, and they shared a foster placement and adoptive resource. The court considered it would not to harmful to sever the legal relationship with Sabrina; Michael and

---

(c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

Ivan would likely be adopted together, mitigating the harm and maintaining their strong sibling relationship.

¶27 The court considered that while Michael was too young to understand adoption, he had expressed to his foster parents that he wanted to stay with them. The court concluded that the child's voice "should ring heavily upon us when a child says this is where I want to be." The court noted that Michael's statement did not mean he did not love his parents, but instead "it means that he has found his place … and he deserves to remain there." The court considered Ivan, at three, to be too young to express his wishes. Each child had a duration of separation from his parents of three years and three months, having never been returned to the parents' care after removal.

¶28 Addressing the final factor of whether each child would be able to enter into a more stable permanent family relationship if the TPR were granted, the court concluded they would, because not granting the TPR risked both boys languishing in foster care. Granting the TPR would allow the children to have a "more stable and permanent family life[.]" The court concluded that in light of the statutory considerations, it would be in the best interests of Ivan and Michael to terminate the parental rights of both parents.

¶29 On June 6, 2023, the court held the dispositional hearing for the petitions to terminate Sabrina's parental rights to Kendra, Kyanna, and Cameron, whose father had died in 2017. The State called the foster parent for Kendra, the foster parent for Kyanna and Cameron, and the ongoing case manager. Sabrina then testified on her own behalf.

¶30 The court's ruling began by addressing Sabrina, stating that "because of her inabilities [she] has not been able to demonstrate that she can safely care for her children." The court stated that Sabrina was not a bad person, but her "shortcomings and her inability to deal with frustration and stresses" over the three years of the cases meant no change had occurred. The court considered that granting the TPR petitions would "give these children stability" and prevent them from aging out of the foster care system as Sabrina herself did. The court considered the final factor of "whether or not the child will be able to enter into a more permanent and stable family as a result of termination … is what carries the most weight out of the factors" for the court. The court stated that it did not want the children to "languish in foster care" and that they needed more stability.

¶31 The court then addressed the statutory considerations with regard to Cameron and Kyanna, who were placed in the same foster care placement and shared an adoptive resource. The court concluded there was a strong likelihood the children would be adopted after the TPR. The foster parents were committed to adopting Cameron and Kyanna. The court noted that Cameron had some issues including an IEP, individual therapy, and neurofibromatosis, which will require ongoing medical care. There was no age or health barrier to Kyanna being adopted, and the court considered both Cameron and Kyanna to be adoptable children. Both children had been placed outside of the home for three years and four months, since February 2020.

¶32 Although both Cameron and Kyanna knew who Sabrina was, the court did not consider either of them to have a substantial relationship with her. The court did not find harm in severing the legal relationship with Sabrina because

16

the children's bond was to each other. The court considered that both Cameron and Kyanna were too young to express their wishes about the termination, especially in light of Cameron's developmental delays, but each child was comfortable with their foster parents. The court noted that the duration of separation for the children from Sabrina was three years and four months. Finally, the court considered that granting the TPR would allow Cameron and Kyanna to enter into a more stable and permanent family life. The court concluded that it would be in the best interests of Cameron and Kyanna to terminate Sabrina's parental rights.

¶33 Finally, the court addressed Kendra. The court considered that Kendra was fourteen years old and she had been in three placements, with the current placement and adoptive resource for about three weeks. The court considered Kendra to be adoptable and that she was beginning to have a "good idea of what she wants to do and where she wants to be" even if the current placement had been a short time. The court did not consider her age or health to be a barrier to adoption. Kendra had behavioral issues being addressed in therapy and with her foster mother, who had experience working with children's needs in foster care. The court noted that Kendra has been out of her mother's care for three years and four months.

¶34 The court considered Kendra's strongest relationship to be with Sabrina, and that she did not have substantial relationships with "any other family members," and it would not be harmful to sever the legal relationship. The court considered that if Kendra were asked, she would most likely wish to live with her mother, but that was not a real possibility and Kendra also expressed liking her

17

foster mother. The court considered that it had been more than three years since removal. The court considered that granting the TPR would give Kendra "permanency," which was in her best interest. The court concluded that Kendra would "be able to enter into a more stable and permanent family relationship as a result of termination taking into account" the three placements, her age, and her relationship with her mother. In light of the evidence and the statutory consideration, the court concluded that it would be in the best interests of Kendra to terminate Sabrina's parental rights.

¶35     This appeal follows. We discuss additional facts below.

## DISCUSSION

¶36     Termination of parental rights is governed by the Wisconsin Children's Code. The first stage is whether the grounds for the TPR exist, typically determined in a fact-finding hearing pursuant to WIS. STAT. § 48.424. The State has the burden to show that grounds for termination exist by clear and convincing evidence. *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶22, 246 Wis. 2d 1, 629 N.W.2d 768. The second step is the dispositional phase, in which the circuit court decides whether the evidence warrants the termination of parental rights. *Id.*, ¶23. The circuit court exercises discretion to determine whether termination is in the best interests of the child, the prevailing factor in the disposition. *Sheboygan Cnty. v. Julie A.B.*, 2002 WI 95, ¶¶24, 42, 255 Wis. 2d 170, 648 N.W.2d 402.

¶37     Sabrina argues that the TPR was granted in error in both phases of the proceedings. She asserts that the State failed to prove all elements of each

18

ground in the TPR; therefore, there was insufficient evidence in the record to support the court's finding that she was unfit on the grounds of continuing CHIPS and failure to assume parental responsibility. Second, she contends that the circuit court erroneously exercised its discretion when it determined that termination was in her children's best interests in the dispositional phase. She argues that there is no support in the record for the court's findings. We reject each of Sabrina's arguments and address them in turn.

## I. *Sufficiency of the evidence in the grounds phase*

¶38 "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." *St. Croix Cnty. DHHS v. Matthew D.*, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. We review the evidence in the light most favorable to the verdict. *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶39, 333 Wis. 2d 273, 797 N.W.2d 854. Whether the evidence was sufficient is a question of a law we review independently. *Id.*, ¶17.

### A. Continuing CHIPS

¶39 The circuit court found that the continuing CHIPS ground, set forth in WIS. STAT. § 48.415(2), existed. To prove this ground, the petitioner had to prove three elements. First, "[t]hat the child has been adjudged to be a child … in need of protection or services and placed, or continued in a placement, outside his or her home" under certain statutory court orders. Sec. 48.415(2)(a)1. Second, that the agency responsible for the child "made a reasonable effort to provide the services ordered by the court." Sec. 48.415(2)(a)2.b. Reasonable efforts are

defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child … the level of cooperation of the parent … and other relevant circumstances of the case." Sec. 48.415(2)(a)2.a. Third, that "the child has been placed outside the home for a cumulative total period of [six] months or longer" pursuant to a relevant court order; "that the parent has failed to meet the conditions established for the safe return of the child to the home;" and, that there is a "substantial likelihood that the parent will not meet those conditions" by the time the child will have been placed outside of the home for fifteen of the most recent twenty-two months. Sec. 48.415(2)(a)3.

¶40 Our examination of the record shows that there was credible evidence presented to support the three elements of this ground. During the case manager's testimony, she reviewed the dispositional order, which satisfied the first element as a statutory order for CHIPS and included the required notice of parental rights. The case manager testified about the agency services as ordered in the dispositional order offered to Sabrina, which included a parenting class, an anger management class, psychological evaluation, a parenting aide, and supervised visitation. Sabrina testified that the conditions of return in the dispositional order were reviewed with her by the court, her lawyer, and the social worker. This is credible evidence of the second element.

¶41 For the third element, Sabrina and the case manager testified that Sabrina completed a parenting class, an anger management class, and a psychological evaluation, although it took second referrals for Sabrina to complete some of the services. Further, although Sabrina participated in the psychological

evaluation, she did not do follow up services with the recommended services for counseling and a psychiatric evaluation.[8]

¶42 The court found that Sabrina did not meet her children's medical needs and she did understand or did not want to understand that the children had special needs. Sabrina did not attend the children's medical appointments and did not speak to the children's medical and dental providers despite the contact and appointment information being provided to her. Although Sabrina did satisfy the conditions to commit no crimes and keep a safe and clean home, the agency still had safety concerns. The record reflects that the case manager's testimony showed that Sabrina did not satisfy all of the conditions of return in the dispositional order. Sabrina did not control her mental health, which included her bipolar disorder. She frequently cancelled visitation and did not always supervise her children and put her children's needs before her own. She did not control her emotions, causing her to leave visitation sessions to calm down from her anger.

¶43 The record also reflects that the case manager's testimony showed that Sabrina was unable to meet her children's special needs which included IEPs for Kendra, Cameron, Michael, and Ivan, resulting in speech therapy and other interventions. Kendra and Cameron had neurofibromatosis, which required medical monitoring. Kyanna was in individual therapy for trauma. Michael was diagnosed with autism. Sabrina had not accepted the children's diagnoses,

---

[8] Sabrina provided testimony from her individual therapist, a licensed professional counselor; however, there was dispute over whether medical releases for the therapist had been received.

attended medical or therapy appointments, implemented treatment programs, or participated in medication management.

¶44     The court's comments showed the difficulty that Sabrina had to meet her children's needs due to her cognitive deficiencies.  The court stated it did not know what more DMCPS and the agency could have done.  The case manager testified to providing repeated, written information to Sabrina in response to the psychological evaluation's findings.  We conclude there was credible evidence to support the circuit court's finding that the third element was proven.  Therefore, the State proved the three elements of the continuing CHIPS ground with sufficient evidence in the record.

¶45     Sabrina argues that her testimony supports that the third element was not satisfied.  She testified that she did not use physical discipline with the children.  She asserts that while the children were in her care, there were no issue with supervision, she met their medical needs, and she kept them clean and well fed.  Although Sabrina's testimony does support her positions, there was ample evidence from which the court could make its findings for the third element.  The IAS that the children were dirty and in need of medical care when evaluated at the referrals in 2019.  Further, Ivan was in danger of falling off the growth chart when he was removed at six months—having barely gained any weight in four months.  The case manager testified about the medical and dental care the children needed when they were removed.

¶46     Sabrina contends that she was able to get the children to school; however, the record reflects that Sabrina had no explanation for the allegation that Kendra missed school a significant percentage of school days while in Sabrina's

care. Further, at the time of removal in February 2020, the four younger children were under age five, and Sabrina's own testimony showed she did not enroll the children in Birth-to-Three programming as recommended. Sabrina argues that she successful completed the programming named in the dispositional order, including the parenting class, anger management class, and the psychological evaluation. Although it is important that Sabrina completed the classes, the record reflects that Sabrina did not apply what she learned in the classes to change her behavior and gain unsupervised visitation. Ultimately, Sabrina's testimony that she managed to satisfy the conditions of return does not overcome the credible evidence in the record to support the court's finding.

### B. Failure to assume parental responsibility

¶47 As a second ground for the TPR, the circuit court found that failure to assume parental responsibility ground, as set forth in WIS. STAT. § 48.415(6), existed. To provide this ground exists, the petitioner must prove that the parent does not have a substantial parental relationship with the child. Sec. 48.415(6)(a). In this context, a "'substantial parental relationship' means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). The factors the court considers includes expressing concern for the "support, care or well-being of the child" and "whether the person has neglected or refused to provide care or support for the child." *Id.*

¶48 Our examination of the record shows that there was credible evidence presented to support the second ground for failure to assume parental responsibility. The case manager's testimony showed that Sabrina did not provide

23

daily supervision, education, protection and care of her children. Sabrina's own testimony reflected that she was not attending doctor's appointments and she never progressed beyond supervised visitation.

¶49 Sabrina argues that her testimony showed her dedication to the children through her visitation with the children and her loving care of them. We do not dispute Sabrina's love and affection for her children. The circuit court did not doubt it. However, parental responsibility requires daily supervision, protection and care of the children as well as their education. Sabrina did not provide this care for over the most recent three years of the children's lives. As the court phrased it, the children had a visitation relationship with Sabrina. The record reflects that her visitation with the children varied in consistency and, in any case, visitation alone would not prove parental responsibility.

¶50 Sabrina asserts that she was responsible for her children's daily needs until removal; however, the ages of the children affect how significant that time may be considered. For the younger children, she was not exercising parental responsibility for the majority of their lives. For Kendra, it was almost ten years; however, the record reflects serious concerns about Kendra's medical care and education. Sabrina asserts that she understood the children's special needs; however, beyond her testimony, there is no evidence to support that she managed their special needs beyond attending some IEP conferences. Again, we do not dispute Sabrina's concern and love for her children. However, we agree with the circuit court's finding that this ground existed was supported by credible evidence.

24

### II. Dispositional phase

¶51 Sabrina argues that the circuit court erroneously exercised its discretion when it terminated her parental rights. We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). During the dispositional phase, the circuit court must make a record that "reflect[s] adequate consideration of and weight to each factor" in WIS. STAT. § 48.426(3). *State v Margaret H.,* 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475. "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane County DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶52 Sabrina argues that the circuit court's weighing of the factor was erroneous. We do not interpret her to argue that the court failed to weigh any of the factors on the record. Our examination of the record shows that the circuit court considered relevant facts for each of the considerations in WIS. STAT. § 48.426(3) and made the best interests of the children the prevailing factor in the disposition. *See Margaret H.,* 234 Wis. 2d 606, ¶35.

¶53 Sabrina asserts that the court did not place enough weight on her love and concern for her children. In our review of the court's discretionary decision making, we search for evidence to support the circuit court's findings, "not for evidence to support findings the [circuit] court could have reached but did not." *Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166. Further, the record reflects that the court valued Sabrina's love for her children, but concluded that her love alone was not enough to meet the children's needs.

¶54 Sabrina argues that the court appeared to hold her mental disabilities against her and the court did not give weight to the strides she made in overcoming the allegations against her parenting. Our examination of the record shows that the court considered Sabrina's parenting in the context of her cognitive disabilities and could not see how the agency or DMCPS could have done more to alleviate that situation. The court made a careful, thoughtful deliberation of the children's best interests in its TPR decision, which is considered "one of the most wrenching and agonizing in the law." *Julie A.B.*, 255 Wis. 2d 170, ¶29. We conclude that the circuit court "properly exercise[d] its discretion" because in its decision, "it employ[ed] a rational thought process based on an examination of the facts and an application of the correct standard of law." *Id.*, ¶43.

## CONCLUSION

¶55 We conclude that the circuit court's finding that Sabrina was an unfit parent based on the grounds alleged in the TPR petitions was supported by credible evidence. We conclude that the circuit court's decision to terminated Sabrina's parental rights to her five children was not an erroneous exercise of discretion.

> *By the Court.*—Orders affirmed.

> This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

26