**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 17, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP81**

Cir. Ct. No. 2022TP12

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.J.Q., A PERSON UNDER THE AGE OF 18:

WINNEBAGO COUNTY DEPARTMENT OF HUMAN SERVICES,

　　PETITIONER-RESPONDENT,

　V.

C.R.Q., II,

　　RESPONDENT-APPELLANT.

　　　　　APPEAL from an order of the circuit court for Winnebago County: BRYAN D. KEBERLEIN, Judge. *Affirmed*.

¶1    GUNDRUM, P.J.[1] C.R.Q, II, hereinafter referred to by the pseudonym Craig Quentin, appeals from an order of the circuit court terminating his parental rights to his daughter, Jamie.[2]  Quentin contends the circuit court erroneously exercised its discretion in concluding termination was in Jamie's best interests.  For the following reasons, we affirm.

## *Background*

¶2    Jamie was born on August 26, 2019, to Quentin and K.G., who were not married.  Winnebago County Department of Health and Human Services (Department) took temporary custody of Jamie and placed her outside her home on November 5, 2019.  The Department filed a petition alleging Jamie was a child in need of protection or services, and on September 3, 2020, the circuit court found Jamie to be a child in need of protection or services.  The court set conditions Quentin had to meet before Jamie could be returned home, which Quentin failed to satisfy fully.

¶3    Quentin had been arrested the same date that Jamie was removed from the home, and he remained incarcerated until March 15, 2021.  After Quentin was released, he began fully supervised visits with Jamie, which transitioned to partially supervised visits in October 2021.  Quentin was again arrested in December 2021 and ordered to attend and complete AODA treatment.  He was admitted to a treatment facility on January 21, 2022, and was in treatment until March 28, 2022, during which time he could not visit with Jamie in person, but he

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]  Jamie is also a pseudonym.

regularly spoke to her on the telephone, and the two had virtual visits. After his discharge from treatment, Quentin again participated in fully supervised visits with Jamie.

¶4 On July 21, 2022, the Department filed a petition to terminate Quentin's parental rights to Jamie.[3] The petition alleged continuing need of protection or services and failure to assume parental responsibility under Wis. Stat. § 48.415(2) and (6). Quentin contested the petition. At the grounds hearing in August 2023, a jury found the existence of the two grounds for termination alleged in the petition: (1) Jamie was a child in need of protection or services, as well as related essential findings, and (2) Quentin had failed to assume parental responsibility for Jamie. The case then moved to the dispositional phase of termination of parental rights (TPR) proceedings. The circuit court held a hearing at which several witnesses, including Quentin, testified.

¶5 After reviewing the testimony and evidence, the circuit court concluded that it was in the best interests of Jamie to terminate Quentin's parental rights. Quentin appeals.

### Discussion

¶6 Quentin only takes issue with the second phase of TPR proceedings, the dispositional phase. At the dispositional phase, "it is within the province of the circuit court to determine where the best interests of the child lie, [however,] the record should reflect adequate consideration of and weight to each factor" in Wis.

---

[3] The petition also sought to terminate K.G.'s parental rights, but this appeal only concerns Quentin.

3

STAT. § 48.426(3). **State v. Margaret H.**, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475; *see* WIS. STAT. § 48.427; **Dane Cnty. DHS v. Mable K.**, 2013 WI 28, ¶59, 346 Wis. 2d 396, 828 N.W.2d 198 ("[T]he best interests of the child" is the "domina[nt]" and "paramount consideration" in the disposition phase of a termination proceeding. (citation omitted)). "In considering the best interests of the child … the court shall consider but not be limited to" the following:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

Sec. 48.426(3).

¶7    We will affirm the circuit court's decision to terminate parental rights unless the court erroneously exercised its discretion. *See* **Margaret H.**, 234 Wis. 2d 606, ¶27. "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." **Mable K.**, 346 Wis. 2d 396, ¶39. "We look for reasons to sustain a

[circuit] court's discretionary decision." ***Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.***, 2009 WI 73, ¶32, 319 Wis. 2d 52, 768 N.W.2d 596.

¶8      Here, the circuit court discussed each of the factors set forth in WIS. STAT. § 48.426(3), and, after weighing the evidence presented, determined that terminating Quentin's parental rights was in Jamie's best interests.  As the court applied the correct standard of law and the evidence supported its decision, the court did not erroneously exercise its discretion.

¶9      Quentin "concedes" that the circuit court considered all of the WIS. STAT. § 48.426(3) factors in terminating his parental rights to Jamie.  He nonetheless asserts that "certain facts introduced before the circuit court led to only one conclusion that a reasonable judge could make:  that termination was not in the best interests of [Jamie]."

¶10     The circuit court found that the likelihood of Jamie's adoption, the first factor, was "no doubt, based on the testimony, significantly high."  It noted that there had been "a great deal of testimony about a past adoption of a half maternal sibling of [Jamie], that the foster family has essentially lived in the same stable residence, that they're willing and able to adopt."  As the Department explains in its appellate briefing, the testimony indicated Jamie had been in the care of the same foster parents since she had been removed from the home— almost her entire life—and the foster parents intended to adopt her, having already adopted Jamie's half-sibling.

¶11     As to the second factor, Jamie's age and health at the time of disposition and at the time of removal from the home, the court noted that Jamie was four years old at disposition and had been removed from the home within months of her birth.  Jamie's age, the court concluded, "weighs heavily" in favor

of termination so as to "giv[e] [her] permanence," a consideration the court viewed as "paramount."

¶12     Consideration of the third factor was "more difficult" for the circuit court.  It referenced the testimony by Dr. Kathryn White, a psychologist, "that there is a relationship between [Jamie] and [Quentin]," which testimony "was buttressed" by the testimony of other witnesses.  The court noted the conflict between White's testimony that Jamie had a strong relationship with Quentin and the testimony of Kathleen Peters, a social worker with the Department, indicating the relationship is "minimal," "plain," and not a "parent-child relationship."  The court discounted White's opinion because she had testified that it would be "difficult for me to imagine when I would evaluate a parent and child and recommend that the parental rights be terminated."  Nevertheless, the court ultimately found that Jamie and Quentin had "a big relationship," which "may even be a substantial relationship."  In addressing whether it would be harmful to Jamie to sever the relationship with Quentin, the court noted that Jamie was currently in counseling.  It stated, "I don't see how [Jamie] doesn't end up [continuing] counseling, regardless of what happens in court today, because there has been a lot that's occurred to her and that's happened in her life."  In the end, the court concluded that the third factor weighed in favor of not terminating Quentin's parental rights to Jamie because of the relationship that they have with each other.

¶13     The circuit court expressed that it was "very difficult to ascertain" Jamie's "wishes," which it was to consider under the fourth factor.  The court gave the least weight to this factor "because for a four-year-old to identify with any certainty what it is her wish is would be very difficult."

¶14    As to the fifth factor, "[t]he duration of the separation of the parent from the child," the circuit court noted Jamie had been separated from Quentin for almost all of her four years of life. *See* Wɪs. Sᴛᴀᴛ. § 48.426(3)(e).  While the court recognized Quentin's efforts to have video contact with Jamie from prison and a rehabilitation center, it noted such contacts were not as preferable and meaningful as in-person contact.  Thus, the court concluded that this factor weighed in favor of termination.

¶15    In considering the sixth factor—whether Jamie would "be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of [her] current placement, the likelihood of future placements and the results of prior placements"—the court emphasized that "if there's not a termination today, the case" would "in all likelihood" continue to be a child in need of protection or services case. *See* Wɪs. Sᴛᴀᴛ. § 48.426(3)(f).  The court observed that Jamie would not be going home with Quentin even if there was not a termination, stating, "[I]f there's not a termination today, … does [Jamie] bounce into the [Quentin] household. … [S]he doesn't."  The court noted that Quentin "has not had more than 17 hours of time with [Jamie] in any one given week over the last 48 months."[4]

¶16    After addressing each of the Wɪs. Sᴛᴀᴛ. § 48.426(3) factors, the circuit court determined that termination was in Jamie's best interest, and it ordered the termination of Quentin's (and K.G.'s) parental rights.

---

[4]  Quentin does not assert the circuit court erred in making these findings.

¶17    Quentin has his own take on the evidence presented at the hearing. He acknowledges that the first statutory factor—the likelihood of adoption of Jamie if his parental rights are terminated—"weighed heavily in favor of termination," but asserts that the third factor—related to whether Jamie had a substantial relationship with Quentin and/or other family members and whether harm would be caused to Jamie by severing the relationship—weighed "heavily against termination." In Quentin's opinion, "the evidence before the court allowed for alternate inferences to be drawn regarding" the second, fourth, fifth, and sixth factors. He asserts that because of this, "the statutory factors, and supporting evidence, were in conflict and opposition. Under such circumstances, no reasonable judge could conclude that termination of [Quentin's] parental rights was in the best interests of [Jamie]," and, as a result, "[t]he circuit court erroneously exercised it[s] discretion in doing so."

¶18    Quentin acknowledges that the circuit court "did not specifically find that the relationship [between him and Jamie] was a 'substantial' one." Nevertheless, he points to White's testimony and maintains that it was clear to her that Quentin and Jamie "have a strong and positive bond" and a "parent-child relationship" that was more than just "playful" and in which Jamie referred to Quentin as "daddy." He further asserts White made it clear that terminating Quentin's relationship with Jamie would be a "traumatic event" and "tragic, harmful in all sorts of ways" for Jamie in the present and future. As the Department points out, however, White also conceded that severing Jamie's relationship with the foster parents would also be detrimental to Jamie.

¶19    Quentin points to the testimony of four other witnesses who testified to observing a strong, healthy and overall positive bond between Quentin and Jamie and to several "visitation log entries" documenting details of visits he had

8

with Jamie after the fact-finding hearing but before the dispositional hearing. According to Quentin, the entries show loving interaction between him and Jamie, including Jamie's desire to spend time with him. Quentin also notes that even though the guardian ad litem ultimately recommended the termination of Quentin's parental rights, she too noted the positive familial relationship between Quentin and Jamie.

¶20 Quentin asserts that Jamie's age at disposition—four years old—is "significant" because she had more time to bond with Quentin than an infant or toddler would have had and further asserts she would be "more difficult to place for adoption than an infant." Quentin's latter assertion is significantly undermined by his acknowledgement that the foster parents with whom Jamie resides testified they intend to adopt her.

¶21 As to the fifth factor, "[t]he duration of the separation of the parent from the child," Quentin acknowledges that Jamie was "two months of age at removal, and four years of age at disposition" but asserts that her age "weighed against termination rather than for it, or was otherwise neutral." *See* WIS. STAT. § 48.426(3). As noted, the circuit court observed that Jamie had been "outside the home" for all but the first few months of her four years of life. And, as the Department points out, Quentin was incarcerated or in a rehabilitation facility from November 5, 2019, until March 2021, and then again from December 4, 2021, until March 28, 2022—accounting for nearly twenty months of the first two-and-one-half years of Jamie's life. While the court recognized Quentin's continued telephonic and video contact with Jamie while incarcerated and in in-patient care, it concluded that such contact was not "as meaningful as it would be in person." Quentin, however, invites us to focus on his own testimony that Jamie was his only child and he has consistently been in contact with her since she

was born as well as focus on other testimony indicating he and Jamie have a strong bond that "withstood the duration of their physical separation, or flourished in spite of it."

¶22     Quentin takes issue with the circuit court giving the "least weight" to consideration of Jamie's "wishes." *See* WIS. STAT. § 48.426(3)(d). He asserts that "this [fourth] factor weighed against termination, or was otherwise neutral" because the "log entries … demonstrate that [Jamie] wished to remain in the presence of her father, and became quite emotional when forced to leave him." As the Department points out, however, other testimony undermined a determination that Jamie wished to be with Quentin instead of her foster parents, specifically, testimony from Dr. Susan Oestreicher and the foster mother regarding an encounter at counseling during which Jamie was dramatically pulling away from Quentin and only allowed the foster mother to comfort her. The foster parents also testified to a similar incident that occurred when they saw Quentin at Packers Family Night, and daycare provider Beth Caramanidis testified that Jamie resisted leaving for visits with Quentin.

¶23     Quentin also disagrees with the circuit court's view of the last statutory factor—"[w]hether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements." *See* WIS. STAT. § 48.426(3)(f). He opines that the circuit court erred in determining this factor favored termination, as he asserts that it was "inconsistent with the significant evidence tendered by [him] demonstrating that he was able to safely parent [Jamie], and could himself provide [her] with a stable and permanent household." Quentin directs us to testimony of two "in-home safety supervisor[s]" indicating that throughout 126 safety checks,

they observed nothing that concerned them as to Jamie's safety; a "parent mentor" indicating she did not "really" have "significant concern regarding the stability of the household or [Quentin's] mental status"; and a caseworker agreeing Quentin had "maintained … adequate and stable housing," as well as stable employment, and "demonstrated an ability to meet [Jamie's] needs" during his supervised visitation periods with her. Quentin notes that his fiancée testified they live together, Quentin is a "great father figure" for her ten-year-old son, and she and Quentin are a "team." The fiancée stated that Jamie is "very comfortable" with her, gives her "a hug right away every time she comes over," and they do mother-daughter type of activities together.

¶24 Quentin further notes the testimony of his employer, for whom he does general maintenance work, which testimony was provided at the fact-finding hearing a month earlier. His employer testified Quentin was a good, reliable employee, and there was "hopeful advancement" for him in terms of both title and compensation. He also directs us to the testimony at that same hearing of a doctor specializing in "the treatment of opioid addiction" who had been treating Quentin for approximately a year. During that time, Quentin did not miss any appointments and urine tests did not show the presence of any illicit drugs other than marijuana. The doctor considered Quentin to be "in early sustained remission from illicit opiate use" and explained that he was taking opiate medication daily that the doctor prescribed to him to help him stay free of other opiate use. The doctor further testified Quentin is "following our protocols and doing very well in the program." Quentin insists in his briefing that "the foster parents were not the only option for familial stability and permanence" for Jamie. He concludes that "this factor weighed against termination, or was otherwise neutral."

11

¶25 At bottom, Quentin's appeal asks us to second-guess the circuit court, reweigh the evidence in a manner similar to how he weighs it, and consider the statutory factors anew. Those are not our functions on appeal. Rather, we are to search the record for evidence supporting the court's exercise of discretion. *State v. Thiel*, 2004 WI App 225, ¶26, 277 Wis. 2d 698, 691 N.W.2d 388 ("We will affirm discretionary determinations if they have a reasonable basis and are made in accord with the facts of record."); *see also Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166 (stating that "appellate courts search the record for evidence to support findings reached by the [circuit] court, not for evidence to support findings the [circuit] court could have reached but did not"). Furthermore, the weighing and balancing of the evidence, the credibility of the witnesses, and the findings of fact are left to the circuit court unless the appellant can demonstrate that the court clearly erred. *See Nicholas C.L. v. Julie R.L.*, 2006 WI App 119, ¶23, 293 Wis. 2d 819, 719 N.W.2d 508 ("[T]he [circuit] court is the ultimate and final arbiter of the credibility of witnesses, and we must accept the [circuit] court's credibility determination[s]."); *State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695 ("[T]his court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous."); *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95 ("We will not reverse the circuit court's findings of fact unless they are clearly erroneous.").

¶26 In sum, we conclude the record clearly shows that the circuit court reasonably exercised its discretion in terminating Quentin's parental rights to Jamie. Quentin has not met his burden to demonstrate to us that the circuit court erred, and we affirm the court's order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.